PAUL, REICH & MYERS, P.C.
By:    Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500                    Attorney for Plaintiff
Philadelphia, PA 19103
(215) 735-9200

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT J. KRAUS and | :CIVIL ACTION |
| MARGARET M. KRAUS, h/w | : |
| | : |
| vs. | :NO.  18-CV-2119 |
| | : |
| ALCATEL-LUCENT, et al. | :ASBESTOS CASE |

## ANSWER TO MOTION OF LOCKHEED MARTIN TO EXCLUDE

## ARTHUR FAHERTY

Lockheed has failed to meet its burden on this motion.  It should be denied.

PAUL, REICH & MYERS, P.C.

By: _Robert E. Paul_____

ROBERT E. PAUL

PAUL, REICH & MYERS, P.C.
By:    Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500
Philadelphia, PA 19103
(215) 735-9200

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT J. KRAUS and<br>MARGARET M. KRAUS, h/w | :CIVIL ACTION<br>:<br>: |
| vs. | :NO.  18-CV-2119<br>: |
| ALCATEL-LUCENT, et al. | :ASBESTOS CASE |

## **MEMORANDUM OF LAW**

Kraus served on the USS Cambria from 1964-1967.  Later he worked for GE in its 32nd

and Chestnut Streets location.  During his service on the Cambria he was near repairs to

Lockheed's SPS-40.  The SPS- 40 was like all electronic equipment [1].  Such equipment on the

Cambria contained resistors and capacitors (Exhibit B, Gossett).  In the period of Kraus' Navy

service the standard practice was use of asbestos for such equipment (Exhibit C documents)

which was opened monthly as part of preventive maintenance (Exhibit B, Gossett).  When the

equipment was opened it made dust that had to be vacuumed out from the deteriorated internal

components (Exhibit B, Gossett, Exhibit D, Kraus).  Kraus testified that the biggest things on the

ships were the radars (24).  His men worked on radios, transmitters and receivers.  There was

periodic maintenance (26) as described by Gossett this was monthly.  The equipment was on

racks which were removed and taken to the shop (20).  The equipment also needed clearing (30-

31).  The overhaul process was completely done in Philadelphia (178).  The SPS-40 broke down

---

[1] Lockheed made this inquiry more difficult by destroying the Technical Manual for the SPS-40 which did exist as late as 1998 (Exhibit A).  This manual would have provided information on what was contained in the equipment.

all the time and had to be modified (210, 215). Lockheed's agent came out to work on the SPS-40 (210)[2]. During that employment GE and RCA made similar electronic equipment used on the Cambria that had to be handled in the same way (Exhibit E). Later Kraus worked for GE in a building filled with asbestos (Exhibit F, Covalevski). Sometime later the GE Aerospace division which succeeded RCA and GE and included Chestnut Street assets were sold to Lockheed's predecessor. GE asserts Lockheed is responsible for the Aerospace division assets, Lockheed asserts GE is still responsible. For the purpose of this motion it will be assumed Lockheed is liable for both its own products and the GE/RCA ones.

Faherty is a graduate of the Merchant Marine Academy, a licensed marine engineer, a former professor of Naval subjects, and a contractor hired by the Navy to repair and clean out ships removing asbestos and a reviewer of naval specifications for many years. As such he is qualified to opine on the subject (see resume and report, Exhibit   ) for which he is offered:

1) Navy specifications on warnings.

2) Asbestos content and likelihood of electronic equipment on ships releasing asbestos dust when handled based on his own experience of removing dust

3) Results of handling asbestos on ships based on hypotheticals from the transcript and documents he has previously reviewed of GE and RCA and Lockheed and those which will be part of the record.

4) asbestos composition of products

5) likelihood of exposures to Lockheed on GE/RCA

---

[2] Lockheed had the original SPS-40 later versions belonged to other manufacturers, see Exhibit A.

6) codefendants notes that these products give off dangerous amounts of asbestos (Exhibit I)

He has reviewed many of the documents concerning equipment on the Cambria and the depositions of the witnesses. As even Lockheed concedes he has personal experience in reading documents and content of electronic equipment, as well as the relevant manuals for shipboard equipment on the Cambria. He has actually removed the resistors from ships. He is thus able to assist the jury in interpreting the manuals and Navy specifications at issue and in understanding the composition of the products to which Kraus was exposed.

Lockheed's arguments mirror many of the argument of co-defendants and all of the answers to the motion to exclude Faherty, Frank and Spector are incorporated by reference under FRCP 10. If Lockheed is liable for GE than the ship aspects of the answer to GE's motion applies and is incorporated pursuant to F.R.C.P. 10.

PAUL, REICH & MYERS, P.C.

By: _Robet E Paul_____
ROBERT E. PAUL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ROBERT J. KRAUS and MARGARET M. KRAUS, h/w | :CIVIL ACTION |
|---|---|
| | : |
| | : |
| vs. | :NO. 18-CV-2119 |
| | : |
| ALCATEL-LUCENT, et al. | :ASBESTOS CASE |

## <u>ORDER</u>

**AND NOW,** to wit, this _____ day of _____, 2020, **Lockheed Martin's**

Motion to Exclude Arthur Faherty is hereby **DENIED**.

BY THE COURT:

_____
J.

## CERTIFICATE OF SERVICE

The undersigned certify that a true and correct copy of the within Plaintiff's answer to

Lockheed Martin's Motion to Exclude the testimony of Arthur Faherty has been filed

electronically. This document is available for viewing and downloading from the ECF system

and was served upon all counsel of record.

_Robert E. Paul_
Robert E. Paul

Date:  January ___16___, 2020

# EXHIBIT A

## ARCHIVED REPORT

For data and forecasts on current programs please visit

www.forecastinternational.com or call +1 203.426.0800

# SPS-40(V) - Archived 5/98

## Outlook

- Production complete
- Upgrades and spares support continue
- Multi-element upgrades will extend operational life into the next century



10 Year Unit Production Forecast
1997 - 2006

No Production Forecast

## Orientation

**Description.** Shipborne search radar.

**Sponsor**
US Navy
Naval Sea Systems Command (NAVSEA)
2531 Jefferson Davis Highway
Arlington, Virginia (VA) 22202
USA
Tel: +1 703 602 3381

**Contractors**
Northrop Grumman Corp
Electronic Sensors & Systems Division
10 Norden Place
Norwalk, Connecticut (CT) 06856
USA
Tel: +1 203 852 5000
Fax: +1 203 852 7698
[formerly Westinghouse Electronic Systems Group, Norden Systems]
(Prime: Development/Production)

Northrop Grumman Corp
Electronic Sensors & Systems Division
P.O. Box 17319
Baltimore, Maryland (MD) 21203-7319
USA
Tel: +1 410 765 1000
Fax: +1 410 993 8771
[formerly Westinghouse Electronic Systems Group]
(Solid-State Transmitter Upgrade)

**Status.** System production complete; upgrades and spares support.

**Total Produced.** Estimated total production was 156 systems. Modification production continues.

**Application.** Surface combatants.

**Price Range.** Undetermined.

## Technical Data

| Dimensions | Metric | US |
|---|---|---|
| Antenna Weight: | 785 kg | 1728 lb |

KRAUSTOLMC01347

information on low-flying aircraft that were in the SPS-40 and SPS-40A blind spot.

**SPS-40C/D.** These solid-state variants add reliability enhancements and combine most of the earlier model features. The SPS-40C went into service in the early 1970s and included the LFDM modification. The SPS-

40D was an improved version of the -C. Both exhibited a 40-percent improvement in reliability and maintainability over the earlier systems.

**SPS-40E.** This is an SPS-40 with the Westinghouse SSTX modification. It has become the standard version of the SPS-40 for the Fleet.

## Program Review

**Background.** Originally developed by Lockheed Electronics, the SPS-40 was introduced into US Navy service in the early 1960s as a replacement for the SPS-31. It was designed for destroyers, but came to be used on numerous classes of ships. It has subsequently been fitted in ships of other navies from South America, Europe and the Middle East.

The Navy deployed ships with the Solid State Transmitter to the Persian Gulf and Red Sea during Operation Desert Storm. In this combat environment, operators reported superior reliability and performance stability from the systems. A hoped-for major retrofit of the SPS-40E to many ships was canceled due to lack of funding.

In February 1996, the Navy announced that it intended to issue a solicitation for integration of the SPS-48E radar with the SYS-2 Integrated Automatic Detection Tracking System (IADT) and for integrating the SPS-40E Radar with the SYS-2(V) (IADT). The specifications for the computer systems were: Motorola Power PC Model, MVME 1604-023, 133 MHz; CPU, MPC 604; Memory Dram, 32 Mb; Memory Flash, 1 Mb; Memory Cashe, 256 Kb; Ethernet Interface; SCSI Interface; Graphics Output; Four Serial I/O; and One Parallel I/O.

Acquisition of the Motorola brand name power personal computer systems was essential to the government's requirements, precluding consideration of a product manufactured by another company. The intended Motorola source has the only verified and validated hardware which could execute the existing tactical software. Therefore, the acquisition would be issued on a sole-source basis.

Generic Simulator Program. In March 1995, the Naval Sea Systems Command announced that they were conducting a market survey to identify sources to provide Generic Navy Stimulators/Simulators (GNSS).

The GNSS is to be built to Open System Architecture (OSA) standards incorporating a functionally modular design using Non-Developmental Items and Commercial Off-The-Shelf products as well as industry-defined software and communication interface standards. An overall objective in the design and development of the GNSS is to provide the Navy with the most cost-effective system which makes maximum use of the inherent Battle Force Tactical (BFTT) System capabilities, while allowing as much flexibility as possible for future growth.

According to the *Commerce Business Daily* announcement, the government will solicit plans to develop, manufacture, install and maintain standardized radio frequency (RF) and intermediate frequency (IF) Stimulators and Digital Simulators for the Surface Navy, on a variety of surface platforms. The GNSS shall consist of a GNSS controller Versa Module Eurobus (VME) and a ship-specific number (1-6) of Radar Signal Generator enclosures capable of producing, either by stimulation or simulation, modeled radar return signals and/or video signals associated with the following radar sets: AIMS MK XII IFF; SPN-35; SPN-43; SPN-46; SPQ-9B; SPS-40 Series; SPS-48 Series; SPS-49 Series; SPS-55 Series; SPS-67 Series; TPX-42; UPX-29; UPX-30; UPX-36; MK 23 TAS; and MK 95 NSSMS.

The Navy anticipated issuing a final RFP in May 1996 with a Cost Plus Incentive Fee development and test contract award in Fall 1996. The contract would contain fixed price options for five subsequent years of production equipment. In addition, product improvement engineering and engineering support would be procured throughout the contract's period of performance.

## Funding

| | | US FUNDING | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | FY96 | | FY97 | | FY98 (Req) | | FY99 (Req) | |
| Procurement (USN) | QTY | AMT | QTY | AMT | QTY | AMT | QTY | AMT |
| SPS-40 | – | 0.0 | – | 7.5 | – | 0.7 | – | 0.0 |

All US$ are in millions.



KRAUSTOLMC01349

## Recent Contracts

No contracts over US$5 million recorded.

## Timetable

| | | |
|---|---|---|
| Jun | 1961 | Initial systems delivered |
| | 1990 | US Navy initiated SPS-40 upgrade |
| | FY92 | Receiver modifications complete |
| | FY94 | SSTx transmitter deliveries, current contract complete |
| | FY96 | Antenna restoration program complete |

## Worldwide Distribution

In service with **Australia, Brazil, Germany, Greece, Japan, Pakistan, Turkey** and the **United States.**

## Forecast Rationale

Although the SPS-40 is an old system, upgrades, enhancements, and repairs have kept it operational and capable. Enhancements capitalized on newer technology to maintain radar performance at an acceptable level.

The Solid State Transmitter was one of the radar's most important upgrades. The transmitter of a high-powered radar is its weak link and the redesigned power amplifiers eliminate this source of trouble, making "fail-soft" the usual failure mode, instead of the sudden, complete failure typical of tube transmitters. In the "fail soft" mode, performance degrades gradually should one or more solid-state components fail. This prevents total loss of surveillance capability and allows the system to operate while repairs are being made.

The solid state components are more cost-effective and maintenance costs are lower. Because budget constraints make it necessary to maintain operations as long as possible with successful equipment, the SPS-40 can plan on a long life on the ships carrying it. Other enhancements and repairs, such as a series of receiver and data processing upgrades and the replacement of many antenna assemblies, are combining with the new transmitter to give the fielded SPS-40s a long life expectancy. Most should remain operational as long as the ship carrying it is active. The Navy continues to seek information on possible upgrades and improvements. Newer systems with more modern designs are available. These include the SPS-48(V) and SPS-49(V); but the Navy continues to deploy a sizable number of surface combatants equipped with the SPS-40C/D/E.

The Navy is involved in upgrade programs for the receiver, receiver signal processor and a solid state transceiver. Many antennas are being replaced. This will extend the operational life of the system. Support will continue for those systems at sea.

## Ten-Year Outlook

No more production expected.

*   *   *

KRAUSTOLMC01350

| Dimensions: | 3 X 5.5 m | 18 X 9.75 ft |
| Below-decks equipment | | |
| Weight: | 1,576 kg | 3,474 lb |

## Characteristics

| | |
|---|---|
| Frequency: | 400 to 450 MHz |
| Channels: | 10 |
| PRF: | 278 to 300 pps |
| Peak Power: | 125 to 225kW |
| Range: | 225 nm (max) |
| Pulse Width: | 3 μsec |
| | 60 μsec (compressed 60:1) |
| Antenna Beam Width: | 11° X 19° |
| Scan rate: | 7.5 or 15 rpm |
| Scan period: | 4 or 8 seconds |
| Clutter Improvement factor: | 54 dB |
| | 66 dB with Doppler Processor) |
| Track initiation: | Automatic |
| Track File Size: | 511 |
| MTBF: | 200 hr  (SPS-40D/E) |

**Design Features.** The SPS-40 is a two-dimensional air search and surveillance radar used by surface ships to detect airborne targets at long and medium ranges. The system was specifically designed for long range surveillance and uses standard search radar operational techniques: MTI; frequency jitter; pulse compression; and several receiver and processor control techniques to enhance detection capabilities.

The most significant change to the radar has been the introduction of a Solid-State Transmitter (SSTx). This replaced the system's old tube-type transmitter, significantly enhancing reliability. The new system uses redundancy and interchangeability to insure maximum reliability and ease of maintenance. The SSTx was designed to degrade gradually and gracefully should components fail, insuring that the radar remains operational in spite of the problem and while repairs can be accomplished.

The SSTx can adjust the output power so Emission Control (EMCON) operations are possible; but it is capable of instantly resuming full power operation from the EMCON state on command of the operator. The transmitter can also adjust to high reflected energy caused by battle damage to the antenna or waveguide.

The system is available in a half-power version for ships involved in coastal operations that require shorter-range sensors. The Solid State Driver cabinets are combined with existing Power Amplifier cabinets to form a single-unit PA configured transmitter instead of two cabinets.

Other receiver, processor and antenna improvements are being considered to update the SPS-40 with new technology. The latest receiver upgrade includes an enhanced signal-to-noise ratio through optimum signal processing. The radar is equipped with interfaces to feed radar data into the ship's combat control system.

**Operational Characteristics.** Like the SPS-49, the SPS-40 is a standard air surveillance radar for the surface fleet. It is found on many older combatants and auxiliaries and supports long-range target detection and tracking, self-defense and fire control system designation. The radar will detect aircraft at long ranges in a variety of sea states, providing early warning of the approach of aircraft and has good range resolution to detect multiple missile raids.. It is IFF capable for air traffic control and threat identification operations.

The system detects, within limits, the approach of low-flying targets. The radar incorporates a variety of electronic counter-countermeasures to insure effective operation in hostile electronic environments. Frequency agility and side-lobe reduction are ECCM features under development. IT was designed to have a limited vulnerability to Anti-Radiation Missiles.

## Variants/Upgrades

**SPS-40B.** This version uses a 3 μsec pulse, 300 pps PRF, Digital MTI, low-flying-target detection mode (LFDM), automatic target detector and various ECCM improvements. Some systems had a Minimum Range Modification (MRM) that provided range and bearing

KRAUSTOLMC01348

## AN/SPS-40 Surface Search Radar

Manufacturer: Northrop Grumman Norden Systems

The AN/SPS-40 is the primary shipboard long-range, high-powered, two-dimensional (2D), surface and air search radar for detection of targets at long and medium ranges. It provides 10-channel operation, moving target indicator (mti), pulse compression, and high data short range mode (SRM) for detecting small, low-altitude, close-in targets. The AN/SPS-40B baseline (which includes the B, C and D radars) is designed to provide optimum performance capabilities with minimum operator interface. Special features of the AN/SPS-40B include long-range resolution and accuracy, light weight and flexible packaging for easy shipboard installation, field proven high reliability, maintainability and availability. The UHF(B) band operating frequency provides freedom from weather clutter and low vulnerability to anti-radiation missiles. The system's digital moving target indicator provides excellent subclutter visibility and has solid-state receiver, power supplies and controls. The receivers sensitivity (minimum discernible signal) is −115dBm with a noise figure of 4.2

The antenna reflector is a truncated paraboloid reflector of open lattice work construction, covered with a wire screen to reduce weight and wind resistance. The dual feed includes the primary radar section and an integral identification friend-or-foe antenna. The primary feed is a slot type, it has a tuned cavity and flared shape to ensure proper illumination of the reflector. The reflector then forms the RF energy into a fan shaped beam with a 19° vertical beamwidth and 10.5° horizontal beamwidth. The antenna has a gain of 21 dB at a sidelobe attenuation of 27 dB in azimuth.

The AN/SPS-40 solid-state transmitter is replacing the tetrode tube transmitter of the surveillance radar, and the new version is designated AN/SPS-40E. The nominal 250 KW output of the transmitter is achieved by combining in parallel 112 power amplifier modules arranged in two groups, 56 each. The stripline approach is used in the design of the large output 56:1 combiners. When compared with their tube counterparts, the AN/SPS-40 solid state transmitters provide improved performance and superior reliability, availability, and maintainability. (The older tube version was in practice extremely sensitive to the vibrations caused by the ship's artillery.)



*Figure 1: Lightweigt antenna of the AN/SPS-40 on Bord of Lütjens class destroyer (© 2013 www.kriegsschiffe.eu)*

### Specifications

| | |
|---|---|
| frequency: | 402.5 to 447.5 MHz UHF-Band |
| pulse repetition time (PRT): | ø 257 Hz (staggered) |
| pulse repetition frequency (PRF): | 300 Hz (non-staggered) |
| pulsewidth (τ): | 60 µs (long range mode) 3 µs (short range mode) compressed to 1 µs (or 0.6 µs) |
| receive time: | |
| dead time: | |
| peak power: | 200 - 255 kW |
| average power: | 2 kW |
| instrumented range: | 370 km |
| range resolution: | less than 0.05 NM |
| accuracy: | |
| beamwidth: | β=10.5°; ε=19° |
| hits per scan: | |
| antenna rotation: | 7.5 or 15 rpm (6 rpm in SPS-40 and -40A) |
| MTBCF: | |
| MTTR: | |

The solid-state transmitter architecture is highly redundant. It is predicted to have a 90 per cent probability of maintenance-free operation for 90 days with no more than 11 per cent projected reduction in radar range performance. The 112 transmitter modules are identical and interchangeable, as also are the power supplies. In the event of component failure, the system undergoes a gradual and graceful degradation in transmitter output. It remains fully operational and capable of detecting targets. The transmitter solid-state technology offers inherent tactical flexibility. For example, output power is adjustable. As a result, ships can reduce their susceptibility to detection while maintaining substantial air surveillance capability. If the tactical situation requires emission control conditions, the solid-state transmitter will respond instantly. Similarly the transmitter will immediately radiate at full power with just the touch of a push-button. Pulse-to-pulse frequency diversity is also provided. A unique automatic levelling control system greatly reduces the need for maintenance actions. This system automatically senses and compensates for degradations in transmitter module performance.

The AN/SPS-40 is operational e.g. on Bangladesh Navy's ship *Somudra Joy* (Hamilton-class). The most AN/SPS-40 radars are replaced by AN/SPS-49(V) radars in the late 1980s and early 1990s.

Versions and improvements:

- AN/SPS-40:  Basic version, manufactured by Lockheed/Martin;
- AN/SPS-40A: slightly modified variant, manufactured by Sperry;
- AN/SPS-40B: including a secondary radar; a total of 43 radars were produced by Norden Systems;
- AN/SPS-40C: improved detection of low altitude flying targets, advanced EPM capabilities;
- AN/SPS-40D: modified 40A version with higher reliability, including a coupling equipment for the AN/SYS-1 system; manufactured by Westinghouse.
- AN/SPS-40E: manufactured by Norden Systems, includes the solid-state transmitter (described above)

Sources: Technical Manual, AN/SPS-40 Radar Set, NAVSEA 0967-LP-441-9010 and NAVSEA Drawing RE-D2699234

# EXHIBIT B

866.MAGNA21

Jury Research
Graphic Consulting
Trial Presentation

MAGNA
LEGAL SERVICES

Court Reporting
Subpoena Services
Document Management

v.MagnaLS.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ROBERT J. KRAUS and
MARGARET M. KRAUS, h/w,

    Plaintiffs,

vs.                                  No. 18-2119

ALCATEL-LUCENT, et al.,

    Defendants.

_____


VIDEOTAPED DEPOSITION OF ROGER GOSSETT

Suffolk, Virginia

Tuesday, August 20, 2019


MAGNA LEGAL SERVICES
(866) 624-6221 .
www.MagnaLS.com

REPORTED BY: DEBRA-LYNN BAKER, RPR, CSR

MAGNA

1    A    Yeah.

2    Q    -- what did you have to do to that

3  wire?

4        And, again, I'm talking about the 390

5  for the moment.  I'll get to some of the other

6  stuff in a bit.

7    A    Well, it's just a matter of

8  determining, you know, you need a wire that's

9  this long or that long, you cut it off, you strip

10  the ends off of the insulation off the wire to

11  expose the conductor and solder it back into

12  place --

13    Q    Okay.

14    A    -- whether it's, you know, 2 inches

15  long or a foot long.

16    Q    What happened when you -- when you

17  cut the wire, as you describe it?  Did you see

18  anything happen, or did you see anything in the

19  air?

20        DEFENSE COUNSEL:  Objection; form.

21  BY MR. PAUL:

22    Q    You can answer the question.

23    A    No.  Well, when you cut the wire, the

24  insulation -- you have special cutters for the

25  wire which, you know, will cut the insulation but

1  not the wire.

2    Q    Yeah.

3    A    And once you cut it, the insulation

4  goes flying into the trash can or on the floor.

5    Q    Did it ever fly in your face?

6        DEFENSE COUNSEL:  Objection to form,

7  leading.

8        THE WITNESS:  No.

9  BY MR. PAUL:

10    Q    Okay.

11    A    You've got to be careful, you know,

12  you don't do things like that.

13    Q    Right.  Were there any other pieces

14  or components of the R-390 that you recall?

15    A    Mechanical components.

16    Q    Well, tell us about electronic.

17    A    Yeah.

18    Q    Okay.  What's a resistor?

19    A    A resistor is a piece of electrical

20  equipment that's made to -- to impede the flow of

21  electronics, and how much it impedes it depends

22  on how it's made.  You can get them that are very

23  low resistance or very high resistance --

24    Q    Okay.

25    A    -- and --

1    Q    Do you know how they're made?

2    A    Basically, yeah.  A bunch of -- first

3  of all, the engineers determine what resistance

4  they need.  Okay?  They're made in certain steps.

5  The compounds that -- the resistive conductive

6  compounds are chosen to provide this

7  plus-or-minus resistance.

8    Q    Okay.

9    A    And then they're incorporated into a

10  package with other stuff to keep them -- what can

11  I say?  To keep it together --

12    Q    Okay.

13    A    -- okay, with two wires sticking out

14  the end.

15        That -- that's strictly the -- the

16  manufacturing process.  Okay?  That has nothing

17  to do with my end where I --

18    Q    Sure.

19    A    -- replace the resistors.

20        But that's -- yeah, that's --

21    Q    Do you know any --

22    A    -- that's basically how I -- how I

23  know a resistor is made.

24        DEFENSE COUNSEL:  Move to strike,

25  lacks foundation, basis of foundation,

1  speculation.

2  BY MR. PAUL:

3    Q    Do you have any knowledge about what

4  the compounds were made of?

5    A    No, I haven't the slightest.

6    Q    Now, we're talking about the 390 for

7  the moment.

8    A    Okay.

9    Q    Was there a difference in resistor --

10  well, were resistors used in lots of other -- in

11  other equipment?

12    A    Yes.

13    Q    Okay.  What other pieces of equipment

14  were the resistors used in that you recall?

15        DEFENSE COUNSEL:  Objection.

16  Again --

17        THE WITNESS:  Every piece of

18  electronic equipment on the ship has resistors in

19  it.

20  BY MR. PAUL:

21    Q    Okay.

22    A    Whether it has -- you know, the

23  number is -- depends on the complexity of the

24  equipment.  Some of the -- the transmitters had

25  hundreds of resistors.

1 and answered.
2 BY MR. PAUL:
3    Q    You can answer.
4    A    Well, circuit boards are made in some
5 of the equipment to plug in and, you know,
6 circuit boards are made of fiberglass, to my
7 knowledge, with the components mounted on them
8 and then some sort of a clear plastic, plastic
9 used in the generic sense, some kind of a sealer
10 to prevent them from getting wet, getting dirty.
11    Q    Do you recall any particular pieces
12 of equipment that had circuit boards?
13    A    Oh, yes.
14    Q    Okay. Go ahead.
15    A    Yeah. The cryptographic equipment,
16 especially, had many circuit boards in it.
17 That's the KWR-26 and the -- KWR-37, the KW-26,
18 KW-7s, they were all pretty much modernized up to
19 where they had 90 percent circuit boards.
20    Q    Okay. And did you have -- where were
21 these -- you did maintenance on these products?
22    A    Yes.
23    Q    Okay. And what part of the ship was
24 that done in?
25    A    Well, if you maintain a circuit

1 board, you pulled it out of the equipment,
2 brought it down to the shop and troubleshot it
3 right there in the --
4    Q    Okay.
5    A    -- in the shop.
6    Q    Okay. When you opened up the
7 equipment, what did you have to do to the
8 equipment? And, again --
9         DEFENSE COUNSEL: Object to form, as
10 overbroad.
11 BY MR. PAUL:
12    Q    Again, we're -- we're talking about
13 either the SRR-13 or the SRR-11 or the 390A or
14 the URR --
15         DEFENSE COUNSEL: Same objection.
16         THE WITNESS: Yeah. Well, you know,
17 depending on how the thing is made, it's -- once
18 you get the equipment open to where you can get
19 at the insides, there's a couple of screws or
20 many screws that you have to take loose to get
21 the module or the circuit board out.
22 BY MR. PAUL:
23    Q    Okay.
24    A    Pull it out, take it to the shop and
25 fix it.

1    Q    Did you ever have to use a vacuum
2 cleaner?
3    A    Yes.
4    Q    Tell me about that. Why would you
5 use a vacuum cleaner?
6    A    Probably once a month, every couple
7 of months you'd open the equipment up, vacuum it
8 out, because dust collected in there, and it was
9 part of our -- let me see. The name of the
10 system was POMSEE. I don't, exactly, know what
11 that stands for, but it was a preventative
12 maintenance shipboard electronic where you
13 cleaned the place out and made sure that
14 everything was pretty and put it back together so
15 that the dust did not accumulate.
16    Q    Now, when you say once a month,
17 you're talking about -- are you talking about
18 once a month in the shop or once a month for each
19 piece of equipment?
20    A    Once a month --
21         DEFENSE COUNSEL: Objection;
22 misstates his testimony.
23         THE WITNESS: Once a month for each
24 piece of equipment. You know, you had a regular
25 schedule --

1 BY MR. PAUL:
2    Q    Okay.
3    A    -- that -- you know, and -- and you
4 had a little book, you had to sign it saying,
5 yeah, yeah, we did it.
6         And you open it up, clean it out,
7 clean the air filters, if so --
8    Q    Okay.
9    A    You know, if it had an air filter in
10 it, and basically make sure it was lubricated and
11 cleaned, put it back together. As long as it was
12 working, leave it.
13         DEFENSE COUNSEL: Move to strike
14 nonresponsive portions.
15 BY MR. PAUL:
16    Q    During the time you were on the
17 Cambria, how many pieces of equipment were
18 maintained or repaired using the vacuum cleaner
19 system that you have described in the shop
20 itself?
21         DEFENSE COUNSEL: Object to form,
22 calls for speculation, misstates the witness's
23 testimony.
24         DEFENSE COUNSEL: Lacks time and
25 scope.

1      THE WITNESS:  I can't really say.  In
2   the shop, I would say very little use of the
3   vacuum cleaner in the shop, because we normally
4   take it to the equipment, open the equipment up,
5   vacuum it, clean it, whatever, and lubricate it,
6   put it back together.
7   BY MR. PAUL:
8      Q     You say -- you are talking about not
9   in the shop but someplace else on the ship?
10     A     That is correct.
11     Q     Okay.  All right.  You mentioned the
12  UR -- WRT-1 and the --
13     A     Yes.
14     Q     -- TED.
15        Tell me about those pieces of
16  equipment.
17     A     Well, WRT-1 is a transmitter, a
18  low-frequency transmitter, which every ship,
19  major ship, has one.  It's basically the same
20  size as the SRT, a little bit larger, again,
21  specifically designed to transmit in
22  low-frequency range as opposed to the
23  high-frequency range.
24        It's a lot of tubes, slide-out
25  drawers.  You know, it's a pretty complex piece

1   of engineering, and it worked pretty good.  Every
2   once in a while, you know, a tube would go bad or
3   something like that, but a pretty good piece of
4   equipment really.
5      Q     Okay.  All right.  I am going to --
6   sir, I am going to ask you to look at what has
7   previously been marked as Plaintiffs' 12 and
8   Plaintiffs' 14.
9        And let's go off the video while he
10  goes through those.
11        THE VIDEOGRAPHER:  Go off record at
12  9:51 a.m.
13        (Discussion off the record.)
14        (Plaintiffs' Exhibit 14 was marked
15        for identification by the court
16        reporter.)
17        THE VIDEOGRAPHER:  We are back on
18  record at 9:52 a.m.
19  BY MR. PAUL:
20     Q     Okay.  Sir, what -- what are you
21  seeing in these pictures?
22     A     This is an SRR-13 receiver.
23     Q     Okay.
24     A     And pretty much the way it's mounted
25  on a ship in its own individual cabinet.

1      Q     Why don't you hold that up to the --
2   to the jury can see it and point to it, what
3   you're talking about.
4        Is that the top --
5      A     Yeah, here.
6      Q     -- one?
7        Okay.  That's what it looks like?
8      A     Yeah, basically.
9      Q     All right.
10     A     This thing is bolted or -- or, you
11  know, in a -- on a table or a mounting of some
12  kind.  The picture here shows you how to get it
13  out of the cabinet.
14     Q     Okay.
15     A     Just pick the handles up and hold
16  them up and slide it out.  Once you --
17     Q     What would happen -- let's start --
18  what would happen when you would pull out the --
19  pull the piece out like that?  What would happen,
20  if anything?
21     A     It comes out to -- to the end of the
22  stop.  It won't go any farther.
23     Q     Okay.
24     A     I mean, you know, you can leave it
25  hang there, if you so desire.

1      Q     Okay.
2      A     But it -- it will tilt up and down so
3   you can look at the top and the bottom, or you
4   can push the buttons on the rail and take the
5   whole thing out and take it to the shop and work
6   on it if -- you know, if it's necessary.
7      Q     Now, the bottom picture, that's when
8   it's actually -- the whole thing is removed?
9      A     Yeah.  That -- that's how to take
10  it --
11     Q     Why don't you show that to the --
12     A     -- off of the --
13     Q     Show that to --
14     A     -- off of the sliding rails.
15     Q     Show that on the video, too, if you
16  would.
17     A     Yeah, right here.
18     Q     Now, you mentioned dust before.  Was
19  there dust when you removed this, when you did
20  this job?
21     A     Well, normally this type of receiver,
22  because it's built specifically for shipboard
23  use, is fairly airtight.  There has to be some
24  circulation to let the heat get out, but normally
25  the thing is cooled off with an internal fan and

1    an air filter.
2              One of the purposes of removing this
3    thing, like it's shown here, is to get at the air
4    filter and make sure it's clean air back in the
5    back of the equipment or, you know, anything
6    that's accumulated.
7        Q    Okay. And, in fact, there was -- you
8    personally recall seeing dust accumulated when
9    these were removed?
10             DEFENSE COUNSEL: Object to form,
11   leading.
12   BY MR. PAUL:
13       Q    If I've -- if I'm stating
14   correctly -- tell me if I'm stating correctly
15   what you --
16       A    Yes.
17       Q    -- just said.
18       A    There -- there were occasions when
19   there were dust inside the equipment.
20       Q    Okay.
21       A    Yeah.
22       Q    Now, was this unique to the SRR-13,
23   or was that true generally?
24             DEFENSE COUNSEL: Object to form.
25             THE WITNESS: No, that's pretty much

1    generally every piece of equipment. The -- the
2    amount of dust, dirt, crud, whatever you want to
3    call it, that accumulated depended on the design
4    of the equipment, how much air could actually get
5    in from outside.
6              And like I said, normally these
7    things are designed to prevent dust from getting
8    in, but you can't make them totally dust-proof.
9    BY MR. PAUL:
10       Q    Okay. Are these -- is this -- are
11   most of these transmitters and receivers high
12   temperature?
13             DEFENSE COUNSEL: Object to form;
14   calls for speculation, vague.
15             THE WITNESS: In my opinion, yeah,
16   you've got to watch out. Especially the tubes --
17   BY MR. PAUL:
18       Q    Okay.
19       A    -- you know, tubes are -- don't grab
20   them until they cool down.
21       Q    And each of these had -- the SRRs and
22   some of these other pieces of equipment you have
23   talked about --
24       A    Yeah.
25       Q    -- all had tubes in them?

1        A    Yeah.
2        Q    Okay. And they were hot to the
3    touch, you say?
4        A    Yes.
5              DEFENSE COUNSEL: Objection; leading.
6    (Plaintiffs' Exhibit 13 was marked
7        for identification by the court
8        reporter.)
9    BY MR. PAUL:
10       Q    Okay. Turn to what's marked on the
11   bottom as LMCKR 39. Do you see that one? It
12   says "Section 4" on the top. "Section 4" on the
13   top.
14       A    39? Oh, okay. Let me see here.
15   31 -- okay. Oh, 39. Okay.
16       Q    Do you see it?
17       A    Yeah.
18       Q    Okay. What do we see here?
19       A    Okay. This looks like removing parts
20   from the internal of a receiver. On this upper
21   picture, you can see the mechanical couplings
22   here where the --
23       Q    Can you hold it --
24       A    -- outside dials and so forth --
25       Q    Hold it this so way so the camera can

1    see it. Go ahead.
2        A    This here?
3        Q    Yeah.
4        A    Okay. Once you get the -- the thing
5    mechanically decoupled, you -- you can pull it
6    out or, as shown in the bottom picture, you can
7    take out a plug-in board.
8        Q    Okay.
9        A    Yeah. This one, the plug-in board
10   there shows resistors, capacitors, whatever you
11   want to call them, and the connecting pins so
12   that they will hook into the -- the main chassis.
13       Q    Can you show me or tell the jury
14   which is the resistors and which are the
15   capacitors in this picture, if you can see them?
16       A    Yeah. Okay. On -- right here, this
17   little darkish thing with the stripes on it,
18   okay, is a resistor.
19       Q    Okay.
20       A    Okay? The stripes indicate the --
21   the particular resistance of the resistor.
22       Q    Okay.
23       A    The size of it indicates whether it's
24   a half a watt, 1-watt, 2-watt, whatever.
25       Q    Okay.

1  shop where we could -- had the room and the
2  tools --
3      Q    Okay.
4      A    -- to take it apart and do what we
5  had to.
6      Q    Okay.  Did you ever work on the
7  antennas?
8      A    Yes.
9          DEFENSE COUNSEL:  Object to form.
10  BY MR. PAUL:
11     Q    Tell me about that.
12     A    Well, the antennas were -- most of
13  them were -- were pretty good.  There was hardly
14  any work that needed to be done, as far as
15  repair.
16         The main thing that had to be done on
17  the antennas was the transmitting and receiving
18  antennas had a big insulator on the bottom, which
19  accumulated saltwater -- or salt spray, I should
20  say, and dust and dirt, whatever, and every once
21  in a while they had to be cleaned off just to
22  maintain proper operation.
23     Q    Do you recall how often you had to
24  clean them off?  And, again, I am confining, you
25  know, to your time on the Cambria.

1      A    Yeah.  I think about every three
2  months.  I'm not sure of -- of the exact
3  schedule, but roughly every three months --
4      Q    Okay.
5      A    -- they had to be cleaned.
6      Q    Do you remember any numbering or
7  nomenclature to describe the antennas?
8      A    Most of the antenn- -- we had two
9  kinds of antennas for the communications, what we
10  call a 35-foot whip, which was an aluminum
11  35-foot long antenna which came in four sections,
12  I believe, and mounted on this large antenna
13  insulation that I mentioned, then we also had
14  wire antennas.
15     Q    I'm sorry, wiring?
16     A    Long wire antennas.
17     Q    Oh, wire antennas?
18     A    A big --
19     Q    Okay.
20     A    -- copper, bronze cable that we ran
21  between one mast and the other and then down to
22  an end insulator where the transmitter fed into
23  it.
24     Q    Do you remember any numbering for
25  these transmitters?  For these antennas, I should

1  say.
2      A    No.  The 35-foot whip, I know it was
3  AS dash something or another, but I don't
4  remember exactly what it was.
5      Q    Okay.
6      A    The long wire antennas, it was
7  however piece of long wire you needed.  There was
8  no number.
9      Q    What does the term -- do you know
10  what the word "SPS-40" means?
11     A    SPS-40, yes.  That's a --
12     Q    What's that?
13     A    -- radar system, air search radar.
14     Q    Okay.  And that's different from what
15  I'm talking about with antennas?
16     A    Yeah.  Well, the SPS-40 antenna
17  itself is -- it's unique to the radar.  It's a
18  rotating antenna which mounts up as high as we
19  can get it, and it's fed by a wave guide from
20  the -- not a wave guide, but a -- okay.  We
21  called it a wave guide, but it was actually a
22  coax, hard coax.
23     Q    Okay.
24     A    And the antenna maintenance itself,
25  it never needed anything done.

1      Q    Okay.
2      A    I mean, you know, the -- the rain
3  cleaned it off.  We -- as long as the motor made
4  it go around and the connections were made
5  between the antenna and down below, it didn't do
6  anything.
7      Q    Were there pieces of the SPS-40 that
8  had to be maintained or worked on?
9      A    Yes.
10     Q    Let me show you what's been
11  previously marked as 6.
12         (Plaintiffs' Exhibit 6 was marked for
13         identification by the court
14         reporter.)
15         THE WITNESS:  Okay.
16  BY MR. PAUL:
17     Q    Is that what we're talking about, the
18  SPS-40?
19     A    Yes.  That's the SPS-40 antenna.
20  Yes.
21     Q    Okay.  All right.  The second page of
22  that document, what is that document to you?
23     A    Okay.  This is a system diagram of
24  the entire SPS-40 system, transmitters,
25  receivers, antennas, everything, all the

1 electronics that are needed to make the whole
2 thing work.
3 Q   Okay.  What parts of the SPS-40 did
4 you and the men working for you have to work on?
5 A   Okay.
6 DEFENSE COUNSEL:  Assumes facts not
7 in evidence, misstates testimony.
8 THE WITNESS:  In the --
9 BY MR. PAUL:
10 Q   And if you are able to, hold it up to
11 the --
12 A   Oh.
13 Q   -- to the picture --
14 A   Sorry.
15 Q   -- and show that to the jury.
16 Go ahead.
17 A   Okay.  The antenna up here is the one
18 that I said, you know, pretty much it's -- unless
19 something broke --
20 Q   Okay.
21 A   -- we hardly ever had to work on it.
22 Q   Okay.
23 A   But the -- the controls -- the
24 electronics, it's rather complex.
25 Q   Why is it complex?  When you say

1 complex, why do you mean that?
2 A   Well, it's -- it's a lot of pieces of
3 equipment here.
4 Q   Okay.
5 A   After I left the Cambria, later on in
6 my career I had an opportunity to serve as an
7 instructor for the SPS-40 alpha radar system at
8 Naval Training Center --
9 Q   Okay.
10 A   -- Norfolk.
11 Okay?  So I'm quite familiar with how
12 complex it is.
13 Q   Okay.
14 A   Okay?
15 Q   Tell me what kind of work had to be
16 done on this, on this SPS-40.
17 DEFENSE COUNSEL:  Object to form.
18 THE WITNESS:  Well, again, it's --
19 it's pretty much the type of thing which -- which
20 works as long as it works.
21 There was one guy, Stubblefield, Dave
22 Stubblefield --
23 BY MR. PAUL:
24 Q   Right.
25 A   -- was the technician who had gone to

1 school on this, and he pretty much knew how
2 things worked.
3 Okay?  And whenever anything went
4 wrong with the -- with the 40, Stubblefield was
5 the guy you called.
6 Q   Did -- we have talked about a number
7 of different pieces of equipment.  We talked
8 about receivers, transmitters --
9 A   Yeah.
10 Q   -- transceivers, resistors --
11 A   Right.
12 Q   -- capacitors --
13 A   Yeah.
14 Q   -- wire and cable.
15 We talked about a lot of products so
16 far.
17 A   Yes.
18 Q   Which, if any of those products, was
19 on this SPS-40 system?
20 A   All of them.
21 Q   Okay.
22 A   I mean, you know, it's a real complex
23 system.  Okay?
24 Q   Stubblefield was the one that
25 primarily worked on that?

1 A   Yes.
2 Q   Okay.  Did you ever see Stubblefield
3 and Kraus together when Stubblefield was working
4 on the SPS-40?
5 A   No, I did not, but that was because
6 the SPS-40 in -- in the radar room, everything
7 was, you know, pretty much filled up.  They --
8 they didn't allow for a whole lot of room.
9 Q   Okay.
10 A   And if Dave Stubblefield was in there
11 working and Mr. Kraus was in there with him,
12 there's no more room.
13 Q   Okay.  Was it part of Kraus's job to
14 monitor what Stubblefield was doing?
15 A   Yes, yes.  He was part of the -- the
16 electronics gang.
17 Q   Okay.
18 A   He was the radar -- part of the radar
19 section.
20 Q   Stubblefield was?
21 A   Stubblefield.
22 Q   You say "He."  I'm just trying to --
23 A   Yeah.  He, Stubblefield, was -- was
24 part of the radar section.  Yeah.  Mr. Kraus was
25 in charge of the radar section and the COMM



Figure 6-4.—Air-search Radar Set AN/SPS-40 system.

120.83

EXHIBIT C



# RECENT ADVANCES IN
# ELECTRONIC PROCESS TECHNOLOGY

MDE–MPE tape capacitors in stages of production. Wafers at left are cured steatite blanks of same general type used in MDE–MPE system. Silver pattern that forms one electrode of capacitor has been applied to two wafers in the center. In wafers at right, adhesive dielectric-coated tape is cut into squares slightly larger than the silver contact and then pressed down onto the wafers. After curing, the capacitor is ready to be assembled into a module with other wafers such as that shown at top left.

SINCE the announcement of a new system for the mechanized production of electronics in 1953, the National Bureau of Standards has developed additional compatible components and techniques under the sponsorship of the Navy Bureau of Aeronautics. Recent advances achieved by NBS in electronic process technology include an adhesive tape capacitor, a "chip" resistor, and a method for applying pyrolytic carbon resistors. Developed by B. L. Davis of the Bureau's process technology laboratory, these components and techniques should do much to increase the versatility and applicability of electronic equipment manufactured by automatic production lines.

The development of systems for Modular Design of Electronics and Mechanized Production of Electronics (MDE–MPE), formerly code-named Project Tinkertoy, was begun by the Bureau with the cooperation of several industrial companies under the sponsorship of the Navy Bureau of Aeronautics as an industrial preparedness measure. The MDE–MPE system starts with raw or semiprocessed materials and automatically manufactures ceramic base wafers, dielectric elements for capacitors and adhesive tape resistors; prints conducting circuits and capacitors; and mounts resistors, capacitors and other component parts on standard, uniform steatite wafers. The wafers are stacked like building blocks to form modules that perform all the functions of one or more electronic stages. The pilot plant, operated by a commercial contractor, incorporates the principles of this system. The plant was designed to produce 1,000 finished and inspected modules per hour.

---

In this chamber electrically conducting solution is sprayed on one side of tape, dried, and then sprayed on other side. When cured, dielectric formulation is sprayed on one side of tape. It is then ready to be used as one element of the capacitor. Spray unit can be seen at far right.

## The Tape Capacitor

The self-adhesive tape capacitor is designed specifically for application to the ceramic wafer by MDE–MPE machine techniques. It is manufactured in much the same manner as the NBS adhesive-tape resistor.[1] A conducting tape, coated on one side with a dielectric, provides one element of the capacitor. The other element is a silver pattern printed and fired on the wafer. It is now possible to apply an adhesive-tape





Application of adhesive tape capacitor to wafer. Although shown here as a manual operation for demonstration purposes, it is normally applied by machine.

resistor to one side of a wafer and an adhesive-tape capacitor to the other side.

The materials required for the manufacture of tape capacitors are a heat-resisting asbestos paper tape, silver flake, silicone resin, butyl cellosolve, a powdered high-K titanate body, n-hexane, and epoxide resin. The electrically-conducting formulation (a mixture of the silver flake, silicone resin, and solvent) is ground in a ball mill. The mixture is sprayed on a loop of tape 1¼ in. wide, allowed to dry thoroughly, and then sprayed on the other side. When cured, the metallized tape is conductive along each side and from one side to the other. After slitting along the center to form two ⅝-in tapes, it is ready for application to the dielectric film. A roll of tape 19 ft long will produce about 350 capacitors.



The dielectric formulation is composed of high-K titanate body that has been pulverized in a ball mill with n-hexane until the particle size is about 1 to 2 microns, after which the slurry is allowed to evaporate under a hood. The ground titanate body is mixed with epoxide resin and further ball-milled. This tacky dielectric mixture is then sprayed on the metallized base tape in various thicknesses determined by the number of passes the tape makes in front of the spray gun. Thicker applications, of course, make capacitors of lower value.

The silver pattern that forms one electrode of the capacitor is applied to the steatite wafer by means of a screen press. It is then dried and fired onto the ceramic. The adhesive dielectric-coated tape that forms the other electrode is cut into squares slightly larger than the silver contact and pressed down on it. A narrow conductive strip, similar to resistor tape but with a conductivity of approximately 0.02 ohm per half inch, is laid down between a contact on the edge of the wafer and the top side of the capacitor. The

complete assembly is then cured by placing it in a oven at room temperature, raising it to 225° C over period of one-half hour, and holding the temperatur at 225° C for 45 minutes.

Capacitors of higher values can be manufacture by applying a number of layers of tape, one on top of another, with appropriate connections to the edge of the wafer. Smaller capacitors can be made by reducing the area of the silver pattern printed on the wafer, or by increasing the thickness of the dielectric layer. For typical values, see table 1.

---

Second element of capacitor is a silver pattern printed on an MDE-MPE wafer. Elements may be printed on either or both sides, depending on requirements of finished circuit. An adhesive tape resistor can be applied to opposite side of wafer instead of a capacitor, if desired.

---

Shelf life tests indicate that the capacitance changes no more than 1 percent during the first month after manufacture, and that there is no change in the dissipation factor, which averages 0.7 percent at 1 kc. However, the capacitance does change somewhat with temperature, −3 percent from 25° to 85° C, and −15 percent from 25° to −55° C. In a load life test, a few capacitors shorted out, but otherwise only negligible changes occurred in capacitance and dissipation factor.

## The "Chip" Resistor

The "chip" resistor is made by applying self-adhesive resistor tape to a small chip of ceramic material. This resistor is not for use in the regular quantity production of modules, but aids the electronic design engineer in studying new modular circuits which are still in the "breadboard" stage or in producing prototype equipments for evaluation. The chip is inserted into a circuit simply by soldering it to the appropriate connections on a standard wafer.

The precured resistor tape is manufactured automatically by the usual MDE–MPE techniques but is applied to a chip of cured steatite about 0.600 by 0.225 in. instead of the standard MDE–MPE wafer. A prototype machine developed in the NBS laboratories

of a highly accurate gas thermometer for this purpose, requires painstaking and time-consuming precision, the work on the secondary thermometer is being pursued concurrently. Resistance thermometers constructed of the semiconducting elements, silicon and germanium, have proved to be extremely sensitive; in some cases the resistance changes more than 50 percent per degree. While satisfactory reproducibility still remains a problem, results of initial tests have been quite promising.

## References

[1] New International Temperature Scale, NBS Technical News Bulletin **33**, 28 (1949).

[2] H. F. Stimson, The International Temperature Scale of 1948, J. Research NBS **42**, 211 (1949) RP1962.

[3] Robert J. Corruccini, Differences between the International Temperature Scales of 1948 and 1927, J. Research NBS **43**, 133 (1949) RP2014.

[4] H. F. Stimson, The measurement of some thermal properties of water, J. Washington Acad. Sci. **35**, 201 (1945).

[5] NBS Technical News Bulletin, No. 305, 71 (1942).

[6] J. B. Garrison and A. W. Lawson, Absolute noise thermometer for high temperatures and high pressures, Rev. Sci. Inst. **20**, 785 (1949).

[7] Robert J. Corruccini, Annealing of platinum for thermometry, J. Research NBS **47**, 94 (1951) RP2232.

[8] Lawrence C. Liberatore and Raymond E. Wilson, Aging changes in clinical thermometers, J. Am. Ceramics Soc. (In press).

# NBS Precured Tape Resistor

THE ADHESIVE-TAPE resistor developed by the Bureau has aroused wide interest since its announcement in 1951.[1] In the NBS tape-resistor system, designed primarily for electronic printed-circuit applications, small pieces of self-adhesive resistance-coated tape are simply pressed into place against metallic terminals at the proper points in the circuit. The resistor was developed as part of a program of miniaturization of airborne equipment sponsored by

the Navy Bureau of Aeronautics. Despite its advantages, the method has been limited in some applications by the necessity for baking the supporting base material to cure the resistors after they have been pressed in place.

A new precured wire-lead version of the tape resistor, now being made at NBS, obviates the need for heat-curing after placement in the circuit. The new resistors are made by pressing uncured resistor tape against both sides of suitable wire or metal-ribbon leads; the leads are thus sandwiched between two pieces of resistor tape. These units are then given the usual heat cure, which bonds the resistor tape to the

---

[1] A high-temperature adhesive tape resistor, *NBS Tech. News Bull.* **35**, 100 (July 1951). *Described in detail in* An adhesive tape resistor system, *NBS Circular 530, Government Printing Office*, 30¢.

 

*Left:* the recently developed precured version of the Bureau's tape resistor can be soldered or spot-welded into the circuit. The original version of the NBS tape resistor is self-adhesive, but must be heat-cured by baking the chassis after all resistors have been pressed in place. The precured resistor is made by sandwiching suitable metal leads between two uncured resistors and then heat-curing, which bonds the resistor to the leads. Over-all length is about 1½ inches. *Right:* soldering one of the precured NBS tape resistors into place. Because no subsequent heat-curing is needed, this version of the tape resistor can be used with chassis that would not withstand curing temperatures (about 300° C.).

leads and results in resistors that may be soldered or spotwelded into the circuit.

With the new precured variation in addition to the basic press-on form, the range of possible applications of the NBS tape resistor is greatly extended. Characteristic advantages of the NBS tape resistor—compactness, stability, and high-temperature operation—are largely retained in the precured wire-lead design. Furthermore, the new resistor might well prove more economical to manufacture in quantity than other types having less desirable characteristics.

The basic NBS tape resistor is made by coating asbestos-paper tape with a mixture of carbon black or graphite, silicone resin, and solvent. Resistor dimensions are standardized at one-half inch long and about one-eighth inch wide; a variety of coating formulations have been developed to give a wide range of resistor values.

Leads for the precured tape resistor are now being made from ribbon of thin silver or silver-plated copper at NBS. Leads extending one-half inch beyond the resistor proper are used, bringing the over-all length to 1½ inches. Thickness is held to about 0.012 to 0.015 inch.

Preliminary tests indicate that the precured NBS tape resistor, when supported in air by its leads alone, will not provide the full dissipation of 0.25 watt at 200° C for which the basic resistor was designed. Further test work is now in progress, and a suitable derating curve will be worked out.

# New NBS Director Appointed

DR. ALLEN V. ASTIN has been appointed* Director of the National Bureau of Standards. Formerly Associate Director of the Bureau, Dr. Astin has been Acting Director since October 1951. Dr. Astin has also been appointed a member of the National Advisory Committee for Aeronautics.

Dr. Astin has been a member of the Bureau's staff since 1932. Until 1940 he was principally concerned with dielectrics and electronics. His contributions include development of improved methods for precise measurement of dielectric constants and power factors of dielectric materials and studies of the nature of energy losses in air capacitors. He did pioneering work in the development of radio telemetering techniques and instruments and applied this work to studies of cosmic rays and of meteorological problems in the earth's upper atmosphere.

In 1940 Dr. Astin was one of the Bureau scientists doing pioneering work in proximity fuze research and development for bombs and rockets. He became chief of the Optical Fuze Section in 1943, assistant chief of the Ordnance Development Division in November 1943, and chief of the Division in July 1948. He played a major part in the development and evaluation of bar-type proximity bomb fuzes and in their introduction to service during the war. During the fall and winter of 1944–45 he served in Europe as representative of the Bureau and consultant for the Ordnance Accessories Division of the National Defense Research Committee, concentrating on proximity fuze problems. He edited the terminal three-volume Technical Report of the Ordnance Accessories Division (Division 4).

As chief of the Ordnance Division from 1948 to 1950, he supervised the Ordnance Laboratory, the Guided Missile Laboratories, and the Electronics and Tube Laboratories. When Dr. Astin was appointed Associate Director in May 1950, he assumed responsibility for the work of the Ordnance Development, Missile Development, Electricity, and Electronics Divisions as well as the Office of Basic Instrumentation.

Dr. Astin was born in Salt Lake City, Utah, on June 12, 1904. He received the B. S. degree in physics from the University of Utah in 1925. While working toward his advanced degrees at New York University from 1925 to 1928, he was a graduate assistant and instructor in physics. From N. Y. U. he obtained the M. S. and Ph.D. degrees in physics in 1926 and 1928 respectively. From 1928 to 1930 he held a National Research Council Fellowship at Johns Hopkins University, doing basic research on measurement techniques relating to dielectric materials. Between 1930 and 1932, he was a Research Associate in a program sponsored at the Bureau by the National Research Council and the Utilities Research Commission, Inc.

Honors and awards he has received include the following: National Research Council Fellow in Physics, 1928–1930; Navy Ordnance Award for Exceptional



Dr. Allen V. Astin

# UNITED STATES PATENT OFFICE

2,010,133

RESISTOR

Sidney Bloomenthal, Merchantville, N. J., assignor to Radio Corporation of America, a corporation of Delaware

No Drawing. Application November 25, 1933,
Serial No. 699,707

16 Claims. (Cl. 201—76)

My invention relates to resistors and more particularly to resistors of types suitable for use in radio receivers, wherein noise occasioned by variations in resistance during the passage of current therethrough must be minimum.

Resistors of types used in radio receivers must be "quiet". That is to say, since such resistors are usually utilized in connection with sensitive thermionic devices, their resistance must not fluctuate while they are conducting electric currents. This requirement must be met to a greater or less degree in the manufacture of all resistors of the types under discussion.

A resistor for use in radio receivers should also have a substantially zero temperature coefficient of resistance and a low load-coefficient of resistivity. That is to say, it should be so made that temperature changes occasioned either by atmospheric conditions or by the passage of electric current therethrough will not materially affect the resistance value.

It is, accordingly, an object of my invention to provide a new and improved resistor that shall be substantially free from noise when used in an amplifier.

Another object of my invention is to provide a resistor that shall have a substantially zero temperature coefficient of resistance during normal operation thereof.

Another object of my invention is to provide a resistor that shall have a low load-coefficient of resistivity.

It is also highly desirable that manufacturing methods be devised and materials provided whereby quantity production of resistors having accurately predetermined values may be had. It is, accordingly, a further object of my invention to provide such methods and such material.

A still further object of my invention is to provide a new resistor material capable of being molded into any desired shape with full assurance that the resulting device will have the predetermined resistance and temperature coefficient characteristics.

The foregoing objects and other objects ancillary thereto I prefer to accomplish, in short, by first coating particles of a filler material, such as asbestos, powdered glass, sand, or the like, or a mixture of filler materials, with a polymerizable resin in solution and thereafter causing conducting material, preferably graphite and/or carbon black, to be precipitated upon the coated particles from a colloidal solution thereof.

The novel features that I consider characteristic of my invention are set forth with particularity in the appended claims. The invention itself, however, both as to its organization and its method of operation, together with additional objects and advantages thereof, will best be understood from the following description of a specific embodiment.

Substantially all fixed resistors used in radio receivers, amplifiers, and the like, include a filler, a conducting material, a binder, and a moisture-repellent impregnating material. The electrical and mechanical properties of the resistor depend not only upon the nature of these components but on the manner in which they are put together.

Previous to my present invention, I made many experiments in the effort to utilize asbestos, glass, or sand singly as well as various mixtures of sand or glass and asbestos, as fillers. For a binding material, I tried many grades of phenol formaldehyde resin in liquid and powdered form or in the form of varnish. For the conducting material, I tried dry graphite and carbon black, but in all of my early experiments I found that, if the conducting material was first mixed with the filler and the binder thereafter added, the resistors made from such a compound were extremely variable in resistance value and could not accurately be reproduced by factory processes.

According to my invention, therefore, I first take a predetermined amount of finely ground glass and air floated asbestos and intimately mix with it a solution of phenol formaldehyde resin (known as bakelite) in acetone. The principal function of the ground glass is to impart to the finished resistor a rough surface to which paint and sprayed metallic terminals will firmly adhere. For the mixing process, I prefer to use a device commercially known as a "kneader" and continue the kneading process until substantially all of the solution is evaporated. At this stage in the process, the mass of material has a dough-like consistency and if a small portion of it is examined under a microscope, it will be apparent that every particle of the asbestos and glass is covered with a film of unpolymerized resin left by the evaporation of the acetone.

The "mix" is next removed from the kneader and is crumbled into particles which are allowed to stand until all of the solution evaporates and it becomes quite hard and brittle. The material is next placed in a ball mill, or grinder of any convenient type, and is ground until substantially all of it becomes fine enough to pass an 80 mesh screen.

While the process of grinding is being carried

on, the conducting material may well be in course of preparation. For this material, I prefer to use a colloidal suspension of carbon in water, such as the graphitic material known to the trade as "Aquadag", manufactured by the Acheson Graphite Company, a gas-carbon suspension known as "Aquablack", manufactured by Binney & Smith Company, or a suitable mixture of the two.

In view of the fact that graphite has approximately one-tenth the resistance of carbon, such as is utilized in the manufacture of aquablack, these two commercial materials cannot be interchangeably utilized in the same proportions. It is, however, desirable to use aquadag for resistor elements having relatively low resistance and aquablack or mixtures of the two suspensions, suitably diluted, for resistors having relatively high resistance.

For resistors having high resistance values, it is particularly desirable to use mixtures of graphite and carbon black made from natural gas. If graphite alone is used for such resistors, the proportion thereof is so small that the particles are quite widely separated. This condition gives rise to noise which is obviated by the presence of carbon black particles that effectively "bridge" the graphite particles.

The 80-mesh resin coated particles are next intimately mixed with the colloidal carbon suspension, which has been diluted with water to a point whereat the liquid is substantially 1% carbon by weight, by a stirring operation and, for this purpose, mixing apparatus of substantially any well known commercial type may be utilized.

For the purpose of explanation of the foregoing paragraph, it is to be understood that the term "colloidal carbon suspension" is intended to include diluted aquadag, diluted aquablack, or a diluted mixture of the two. It is also within the scope of my invention to first mix the resin coated particles with either one or the other of the first-mentioned solutions, and to thereafter mix or add the other solution, thus causing successive precipitation of carbon in different forms on the particles.

Under usual conditions of manufacture, the introduction of the resin-coated filler material into the colloidal carbon suspension disturbs the electric charge relations existing in the said suspension, with the result that the carbon is precipitated onto the filler material and forms a conductive film over the entire surface of each minute particle thereof. Under certain conditions the colloidal suspension of the carbon persists and, in such case, I find it advisable to add to the mixture a small amount of hydrochloric acid which coagulates it and causes the precipitation hereinbefore mentioned. As an alternative, for the purpose of coagulating the colloidal suspension, I may add to the acetone solution of the resin, before coating the filler particles therewith, a small amount of furfural or some other volatile material such as acetic acid, having an ionizable hydrogen atom with which it readily parts. For this purpose, I have also obtained fairly good results with small quantities of an organic acid such as malic, citric, tartaric, or the like.

After the carbon is precipitated onto the filler material particles, the supernatant liquid is either drained off or the solution is filtered in a filter press or the like. The cake resulting from the filtering process is dried at a temperature of approximately 40° C., for 24 hours, or, at least, for a period of time sufficient to drive off substantially all of the residual moisture.

In order that the continuity of the carbon film on the filler particles shall not be incerrupted, the dried cake must be handled rather carefully. In other words, it is highly inadvisable to subject the cake to any further grinding operations to prepare it for handling, and at this point in the process it is found best to manually crumble the cake into small particles suitable for charging a molding machine.

The crumbled material is next loaded into the hopper of an automatic "pill" making machine, such as is used in the drug industry, or into equivalent well-known apparatus, which forms it into cylindrical rods under a pressure of the order of ten tons per square inch. For the sake of uniformity, I prefer to form rods ¾'' in length and ¼'' in diameter if the power rating thereof is not to be in excess of one watt. The rods made as described are then placed in trays and baked in an oven at 170° C. for approximately one hour.

I am not, at this time, prepared to exactly explain all of the physical changes caused in the pill by the baking process and consequent polymerization of the resin coating underlying the carbon on each particle of filler.

It appears, however, that during the baking step of the process, the carbon films on the particles merge together to provide what might be termed a "honeycomb" structure, of conducting material, and that the polymerization of the binder serves to lock the elements of the said honeycomb structure firmly in place, without disturbing the continuity of the carbon contacts. However, in view of the fact that the carbon films are extremely thin, it is, of course, probable that some of the resin may seep through them and bond with resin from other particles. As a matter of fact, the binder does not appear to have any pronounced insulating action and it may well happen that the theory first above given is correct.

In order that my disclosure shall be complete, the following specific directions for making 1000 resistors, each having a resistance of 700 ohms and each capable of dissipating one watt, are given:

For the above purpose, I take 5 lbs. of glass ground to pass a 150 mesh screen, 2¼ lbs. of airfloated asbestos, and mix them in a kneader with 1.62 lbs. of phenol-formaldehyde resin dissolved in 8 lbs. of acetone.

To coat the amount of filler material specified, in order to obtain the desired resistance characteristic, requires .126 lbs. of graphite. This weight of graphite is contained in .63 lbs. of commercial aquadag which is diluted by adding to it approximately 5½ pints of distilled water to form a colloidal suspension having the required density.

The following table gives relative proportions of filler, resin, and carbon for a number of finished resistors ¾'' long and ¼'' in diameter:

| Asbestos | Resin | Graphite | Carbon black | Glass | Resistance |
|---|---|---|---|---|---|
| Percent | Percent | Percent | Percent | Percent | |
| 72 | 25 | 3 | | | 700 ohms. |
| 73 | 25 | 2 | | | 2000 ohms. |
| 74 | 24.5 | 1.5 | | | 500000 ohms. |
| 24 | 18 | .7 | 2.3 | 55 | 1.2 megohm. |
| 24 | 18 | 1.2 | 2.3 | 54 | 17000 ohms. |
| 24 | 18 | 1.4 | 2.3 | 54 | 11000 ohms. |

From the foregoing table, it will be apparent

that a resistor having any desired resistance characteristics may be made by suitably choosing the relative amounts of filler and conducting material. It will also be noted from the table that the variation in the resin content plays a very minor part in the resistance of the finished article, which is in accordance with the theory hereinbefore advanced.

After baking, the resistor rods must, of course, be provided with suitable terminals. For this purpose, I find it best to utilize the Schoop metal spraying process and I apply to each end of the resistor a ring of copper or tin extending inwardly from the end a distance of $\frac{1}{16}''$. Obviously, the resistance of the rod measured from end to end can be further controlled at this point in the process by adjusting the width of the sprayed terminals. As a general rule, however, this is not done in the factory, for the reason that it is much more convenient to so arrange the spraying machinery that all resistors are provided with terminals of the same width.

After the terminals have been sprayed onto the ends of the rods, the rods are immersed in a moisture-repellent impregnating material such as melted carnauba wax, aerclor, halowax, sincera wax, cerawax, paraffin, linseed oil, or the like, which has no solvent action on the polymerized resin at any operating temperature. The melted wax is preferably maintained at a temperature of 170° C., and the rods are kept therein for approximately forty five minutes. Carnauba wax is particularly advantageous to use as the impregnating material since, by reason of its expansion within the interstices of the resistor rod, at temperatures below its melting point, it compensates, to some extent, for changes in resistance occasioned by temperature rise. I have also found linseed oil to be quite satisfactory, since it oxidizes and forms a surface coating which is thoroughly waterproof. Linseed oil, however, necessitates an extra baking step to effect this oxidation.

A resistor manufactured according to my improved method offers many advantages not heretofore obtained. In the first place, the process utilizes carbon which can be purchased in its processed form and is immediately available. Secondly, the resistance values can be duplicated fairly accurately and, in addition, the electrical characteristics can be accurately determined and controlled, while the finished resistors exhibit extremely low load coefficients of resistivity. Naturally, I am aware that certain of the mentioned advantages have been approached in the past, but it is my belief that no resistor now on the market exhibits them to as great an extent as a resistor manufactured according to my improved process.

Although I have disclosed herein certain specific proportions of filler, resin, and conducting material, these are given merely by way of example and are not to be construed as in any way circumscribing the scope of my invention. Many other modifications will be apparent to those skilled in the art and my invention, therefore, is not to be limited except insofar as is necessitated by the prior art and by the spirit of the appended claims.

I claim as my invention:

1. An as element of a resistor device, a particle of inert, substantially non-conductive filler material, a coating of insulating material thereon, and a film of conducting material upon the outer surface of the insulating material.

2. As an article of manufacture, a resistor composed of particles of inert filler, substantially all of said particles being respectively coated with an insulating material carrying an outer film of conducting material, the films of conducting material being in intimate contact with each other throughout the mass of said resistor.

3. The invention set forth in claim 2, wherein the insulating material is a polymerized phenol formaldehyde resin.

4. The invention set forth in claim 2 wherein the conducting material films are bonded together into a quasi-honeycomb structure.

5. The process of manufacturing a material from which resistors may be formed which comprises coating a plurality of particles of inert material with an insulating layer and thereafter depositing a conducting surface film upon substantially all of said particles.

6. The process of manufacturing a material from which resistors may be formed which comprises coating the surface of a plurality of particles of inert filler material with a polymerizable material, and thereafter causing a film of conducting material to be deposited upon the surface of the polymerizable coating.

7. The method of manufacturing a material from which resistors may be formed which comprises mixing a mass of inert material particles with a solution of a polymerizable material in a volatile solvent, causing the solvent to evaporate and then applying to the surface of substantially all of said particles an adherent coating of conducting material.

8. The invention set forth in claim 7 characterized in that the inert material is a mixture of asbestos particles and ground glass.

9. The method of manufacturing a material from which resistors may be formed which comprises moistening a mass of air-floated asbestos with a solution of a phenol formaldehyde resin in a volatile solvent, causing the solvent to evaporate, mixing the residuum with a colloidal suspension of carbon, causing the carbon to be precipitated from the suspension onto the surfaces of substantially all of the particles of asbestos, and thereafter removing the remaining solute.

10. The method of manufacturing fixed resistors which comprises intimately mixing a mass of comminuted inert filler material with a solution of phenol formaldehyde resin in a volatile solvent, causing the solvent to evaporate whereby the resin is deposited as a coating upon the particles of filler, mixing the coated particles with a colloidal suspension of carbon, causing the suspension to coagulate to thereby precipitate the carbon onto the surfaces of the particles, removing the surplus vehicle of the suspension, molding the residuum into appropriate shapes, and thereafter baking the molded articles at a temperature sufficiently high and for a sufficient length of time to cause the resin to polymerize.

11. The invention set forth in claim 10 characterized in that the inert filler material is asbestos and ground glass.

12. The method of manufacturing a material from which resistors may be formed which comprises moistening a mass of inert filler particles with a solution of phenol-formaldehyde resin and a reagent capable of causing the coagulation of a colloidal suspension of carbon in a volatile solvent, causing the solvent to evaporate, and introducing the resin-coated filler particles into a colloidal suspension of carbon.

13. The method of manufacturing a material from which resistors may be formed which comprises moistening a mass of inert filler particles with a solution of phenol-formaldehyde resin and furfural in a volatile solvent, causing the solvent to evaporate, and introducing the resin-coated filler particles into a colloidal suspension of carbon.

14. The method of manufacturing a material from which resistors may be formed which includes moistening a mass of inert filler particles with a solution of a phenol formaldehyde resin and an organic acid dissolved in acetone, causing the solvent to evaporate, and introducing the resin-coated filler particles into a colloidal suspension of carbon.

15. A resistor element in the form of a rod constituted by a plurality of particles of inert filler, substantially all of said particles having a first coating of an insulating material and an outer coating of graphite and carbon black, the said particles being in such intimate contact with each other that a substantially uninterrupted electrically conductive path is established between the ends of the rod.

16. The method of manufacturing a resistor which comprises coating each of a plurality of particles of inert filler with polymerizable resin, superimposing a film of conducting material upon the resin coating, compressing the filmed particles into a coherent mass, polymerizing the resin coating to lock the particles in place and thereafter impregnating the mass with a moisture repellent material incapable of dissolving the polymerized resin at temperatures encountered during ordinary use of the resistor.

SIDNEY BLOOMENTHAL.

EXHIBIT D

IN THE COURT OF COMMON PLEAS

PHILADELPHIA COUNTY, PENNSYLVANIA

    –  –  –

| | | |
|---|---|---|
| ROBERT J. KRAUS and | : | APRIL TERM, |
| MARGARET M. KRAUS, | : | 2018 |
| h/w | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALCATEL-LUCENT, et | : | |
| al. | : | NO. 3448 |

    –  –  –

November 27, 2018

    –  –  –

Videotape trial of ROBERT
KRAUS, taken pursuant to notice, was held
at the offices of Magna Legal Services,
1635 Market Street, Philadelphia,
Pennsylvania, commencing at 9:40 a.m., on
the above date, before Melissa Broderick,
a Professional Court Reporter and Notary
Public for the Commonwealth of
Pennsylvania.

    –  –  –

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



1    candidate school.  If they accept you,
2    then you go to Newport, Rhode Island, and
3    you basically study Navy.  You study
4    leadership.  You study everything you
5    ever wanted to know about the military,
6    what is it is and what your status in the
7    organization and so forth.  They teach
8    you navigation and a lot of the things
9    associated with sailing.
10      Q.    What did -- what was your
11   job duties in the Navy?
12      A.    So after I graduated from
13   OCS, I accepted the commission as an
14   ensign.  I'd actually been an enlisted
15   man.  When you go to OCS, if you fail
16   out, you would end up in the enlisted
17   Navy.
18      So I have two honorably
19   discharges, one from there, one from
20   officer candidate school, and the second
21   from the Navy.
22      But my assignment, I was --
23   the day after I was commissioned, which
24   was in June.  I don't remember the exact

1   date, but it's in my data here -- I was
2   ordered to report to a ship, the USS
3   Cambria.
4      And it was actually a
5   two-step process.  First, I was supposed
6   to report to training school in, I think
7   it was, Little Creek, Virginia.  Because
8   the Cambria is an amphibious Navy -- it's
9   one of the ships that carries the
10   Marines -- we traveled in a squadron, and
11   so I needed to know more about that.  So
12   they sent me to school for that.
13      The ship was in the
14   Mediterranean at that time.  It came back
15   to the states.  And so as the -- I was
16   appointed the electro -- electronics
17   material -- EMO.  I think it's electronic
18   material officer was the title they gave
19   me.  It had specific responsibilities.
20      Q.    What were those?
21      A.    And I was responsible for
22   every piece of electronic equipment on
23   that ship working constantly and
24   regularly.

1      Q.    Can you describe types of --
2   when you say electronics equipment, what
3   are you talking about?
4      A.    The two biggest things we
5   had were two radars.  We had an air
6   search radar and surface search radar.
7   The air search radar would see out about
8   300 miles.  And that's what it did.  It
9   looked for aircraft.  Also, looked for
10   missals --
11      Q.    Okay.
12      A.    -- that were aimed at the
13   ship.
14      We also had a piece of
15   equipment, electronic countermeasures
16   equipment, which was used to try to
17   confuse any missals, if they were sent to
18   our ship.  So that's the air search
19   radar.
20      We had a surface search
21   radar, which is just as important.  In my
22   opinion, these were about two of the most
23   important pieces of equipment on the
24   ship, because without them, you can't

1   see.  You can't see enemies.  You can't
2   see anything you might run into.  We
3   would typically sail darkened ship when
4   we were in a squadron.
5      The brunt of the equipment
6   was the radios.  We had radio,
7   transmitters, and receivers.  Last count,
8   we had almost -- that I did from a list I
9   prepared -- and you've all seen that, I
10   think -- we had over 300 -- after the
11   ship had an overhaul, it was shortly
12   after I went aboard the ship -- we had
13   over 300 pieces of electronic equipment
14   on the ship.
15      Q.    What did you have to do with
16   the electronic equipment?
17      A.    It was considered a
18   managerial job, or you could also
19   consider it -- I mean, it was largely
20   administrative.  What I did is I actually
21   worked -- I worked out of the ET shop.
22      Q.    What is that?
23      A.    Which is a shop on board the
24   ship that was specifically for



1  maintaining and repairing all the
2  electronic equipment.
3        And so I was responsible for
4  making sure that all of the regulations
5  -- and the Navy has a lot of regulations
6  on when and where and what happens to
7  every piece of that equipment. As a
8  matter of fact, at one point in time, I
9  had to sign for every piece of equipment,
10 okay.
11       And so there were periodic
12 maintenances that were required for
13 different -- it varied depending on the
14 piece of equipment. And we had a lot of
15 other types of equipment, too, besides
16 radios, but I won't go into that for this
17 second.
18       But each piece of equipment
19 had its own special card, okay. And it
20 kept track of -- and other documents that
21 went along with that -- kept track every
22 time that one of those pieces of
23 equipment came in, when it was
24 maintained, when it was due for another

1  regular maintenance.
2        And we made changes to the
3  equipment periodically, if it was
4  improved or updated, and we would do some
5  type of an alteration. A lot of these
6  things were called ship alts.
7        And so I was just there for
8  that purpose, to make sure that -- that
9  position was to monitor, make sure that
10 all of these things were done. If there
11 was a particular issue with a particular
12 piece of equipment, I had to know about
13 it. I had to do something about it.
14       We've had situations where
15 -- we had 24 landing craft on board that
16 ship to land 1200 Marines that we
17 carried. And the radios we were using on
18 those boats, when we put the Marines in
19 the water on our boats, they'd typically
20 go out, and they would circle until they
21 were all in this formation. They had to
22 be able to communicate with the ship.
23 They had to be able to communicate with
24 each other. And they were still using

1  World War II radios that they were
2  constantly breaking down.
3        So that was one of the
4  things we had to find a resolution for,
5  that is, me and -- I had the chief petty
6  officer. That's equivalent to a sergeant
7  in the Army, if you're not used to Navy
8  lingo. And, eventually, to a master
9  chief petty officer, as my ET crew grew
10 from 12 to some higher number, 15 or so.
11       So it was an administrative
12 job that doesn't sound very sexy, but it
13 had an awful lot of problems that we had
14 to work out.
15    Q.   Well, you've mentioned --
16 used a couple of terms, and I wanted to
17 ask you about those. You used the term
18 "periodic maintenance" a minute ago.
19    A.   Uh-huh.
20    Q.   What is periodic
21 maintenance? What happens in a periodic
22 maintenance?
23    A.   Typical piece of equipment
24 -- most of the equipment on -- the

1  electronic equipment was rack mounted.
2     Q.   What does that mean?
3     A.   And that means there were
4  literally these racks -- these structures
5  that are like a framework. And there --
6  a lot of them are in the radio -- I say
7  radio rooms. We had about -- I think, up
8  to five radio rooms on the ship, because
9  we were the flagship, so we carried the
10 flag officer. He had all of his own --
11 duplicated everything we had except for
12 the radars.
13       So maintenance, we would
14 bring the piece of equipment in. We'd
15 take it out of the rack. So now, where
16 you could originally see the front panel,
17 but you couldn't see the rest of the
18 particular electronic equipment, when you
19 took it out, you could see all of that
20 because it was cabinets that enclosed it
21 were still sitting back in the radio
22 room.
23       We'd bring it down to the ET
24 shop. And the first thing they would do

**MAGNA** ▶
LEGAL SERVICES

1  is they would clean it, okay.
2      Q.   When they cleaned it, what
3  did they do?
4      A.   There were two different
5  ways they typically cleaned it.  One,
6  they used a vacuum, and would vacuum out
7  every part of the radio they could get
8  to.
9          And the second was -- well,
10  they used some chemicals periodically, if
11  there was corrosion, or if there were
12  problems with any equipment making proper
13  contact with switches, for example, that
14  were in there.  We would -- so that was
15  it.
16      DEFENSE COUNSEL:  Belated
17  objection.  Overbroad as to
18  equipment and time.
19  BY MR. PAUL:
20      Q.   Why did the radios and these
21  other pieces of equipment have to be
22  vacuumed?
23      A.   Easiest way to say it is
24  they got dirty.  It's like anything else

1  in your house, if you let it sit there
2  for a long time -- and they were -- and
3  they were hot, typically.
4      DEFENSE COUNSEL:  Same
5  objection.
6      THE WITNESS:  Most of the
7  radios had electronic tubes.  Some
8  had electronic tubes and
9  transistors, a combination.  And
10  if you've ever looked in anything
11  -- any piece of equipment, like
12  your TV, for example, at home,
13  it's going to get very dusty
14  inside.
15      And so that's basically what
16  they were doing, vacuuming
17  whatever dust was in there.
18  BY MR. PAUL:
19      Q.   What do you recall -- do you
20  recall any components of these radios?
21      DEFENSE COUNSEL:  Objection.
22  Overbroad as to equipment and to
23  time.
24      MR. PAUL:  You can answer

1  the question.
2      THE WITNESS:  Could you
3  repeat the question?
4      MR. PAUL:  Yeah.  Have it
5  read back.
6          - - -
7      (The court reporter read the
8  pertinent part of the record.)
9          - - -
10      DEFENSE COUNSEL:  Also
11  compound.
12      THE WITNESS:  I'm not sure
13  what you mean by components, but,
14  for example, there were circuit
15  boards.
16  BY MR. PAUL:
17      Q.   Circuit boards?
18      A.   If that's what you're
19  talking about, yeah, circuit boards.
20      Q.   Okay.
21      A.   The tubes themselves.  They
22  were all components.  So if a tube went
23  bad, you could pull it and replace it.
24      Q.   Okay.  Circuit boards, you

1  have to pull circuit boards yourself?
2      A.   We would --
3      DEFENSE COUNSEL:  Same
4  objections.
5      THE WITNESS:  There were two
6  ways -- two kinds of ways to take
7  care of circuit boards problems.
8  One, you could find out if there
9  was component that was bad, for
10  example.  Well, the tube I just
11  mentioned.  But they both have
12  circuit boards.
13      But the transistor, you
14  could detect a bad transistor and
15  replace that.  Sometimes, if you
16  couldn't find the problem in the
17  circuit board, then you replace
18  it, yeah.
19      DEFENSE COUNSEL:  Move to
20  strike nonresponsive portions.
21  BY MR. PAUL:
22      Q.   Was there any kind of cloth
23  or pad inside the radios?
24      DEFENSE COUNSEL:  Objection;

MAGNA ▶
LEGAL SERVICES

BY MR. PAUL:

Q.   What did you do as part of that second overhaul?

A.   Let me back up a little bit. So it was an unusual type of situation because we took the ship to dry dock in Philadelphia. Our home port was Norfolk, Virginia. We took the ship to the dry dock in Philadelphia, Philadelphia Naval Shipyard.

And then we kept on board the crew that was needed to do the electronic overhauls that we were going to do at that point in time. Okay. We lived on the ship. We took every piece of equipment that was on the ship, including the stuff from before -- that we had before, plus the new equipment that came aboard, and we overhauled or did whatever maintenance was needed to update the -- to make sure all of the changes to the equipment that was already on board were done.

And, effectively, we took --

except for the radars, I think every piece of equipment we had, we brought into the ET shop. And that was the main purpose for the ET shop.

DEFENSE COUNSEL: Objection; move to strike, lacks foundation.

DEFENSE COUNSEL: Move to strike nonresponsive portions.

DEFENSE COUNSEL: Can the court reporter read that last answer?

- - -

(The court reporter read the pertinent part of the record.)

- - -

DEFENSE COUNSEL: Move to strike speculative portions.

MR. PAUL: Okay.

THE WITNESS: Next, I heard -- are we still on?

MR. PAUL: We're still on. Yeah.

THE WITNESS: I mentioned that we didn't bring the radar in.

I think we missed that somehow, but...

THE COURT REPORTER: I said that.

THE WITNESS: Oh, you did?

THE COURT REPORTER: Yeah.

- - -

(The court reporter read the pertinent part of the record.)

- - -

BY MR. PAUL:

Q.   All right. Well, let's talk about what was in the shop, and then we'll talk about the radar.

What did you see done in the shop during the second overhaul in 1965?

A.   I lived in that shop basically. I mean, I wasn't standing watches. I wasn't doing any of my other duties. I mean, there were two rooms on that ship. You don't walk around on the ship in dry dock much. I was either in the ET shop, or I was in my room sleeping.

I saw every piece of equipment they brought in. I saw more than some of the ETs because they tend to work on certain pieces of equipment.

Q.   What kind of maintenance --

DEFENSE COUNSEL: Move to strike nonresponsive portions.

BY MR. PAUL:

Q.   Okay. What kind of maintenance did you see performed on the equipment in the ET shop during the second overhaul?

DEFENSE COUNSEL: Objection; form, vague, compound, overbroad, lacks foundation.

THE WITNESS: It's a combination of different things they did. I forget the name they have for them, but they had -- I think they called them field changes. There was -- any type of a change -- as equipment aged, the Navy would make modifications. For example, they took some

MAGNA
LEGAL SERVICES

1  radios, and they maybe replaced
2  them with other radios that were
3  solid state. So that would be a
4  case where they would -- we would
5  actually lose a piece of
6  equipment. We'd get a substitute
7  for it.
8      But for the most part, we
9  would just look for changes that
10 could be made in the equipment
11 that's already on board, that
12 would update the equipment --
13 particular equipment.
14     We had -- other things that
15 we did, if there were any tubes --
16 any electronic equipments that
17 weren't working properly, we'd
18 service them, just the same as we
19 would have if we were at sea. The
20 only real difference was -- focus
21 was that we weren't at sea.
22     And we brought every piece
23 of equipment we had on board the
24 ship because they were all -- we

1  could shut them all down. You
2  can't do that when you're at sea.
3  BY MR. PAUL:
4      Q.  Did you --
5      A.  So we -- at least as a
6  minimum, we'd take each piece of
7  equipment, unless it had been done very
8  recently, we'd clean it. If anything had
9  to be adjusted, then we'd readjust it.
10     Q.  What was the condition --
11     DEFENSE COUNSEL: Move to
12 strike the speculative and
13 nonresponsive portions.
14     DEFENSE COUNSEL: Can we
15 move the microphone a little
16 closer to the witness?
17     THE WITNESS: Oh, sure.
18     DEFENSE COUNSEL: Thank you
19 so much.
20 BY MR. PAUL:
21     Q.  What was the condition --
22 and this something -- we're going to go
23 off the tape a minute -- what was the
24 condition of the room where all this work

1  was going on?
2      DEFENSE COUNSEL: Objection;
3  form, leading, lacks foundation,
4  assumes facts not in evidence,
5  vague.
6      THE WITNESS: It was very
7  cluttered. It was very busy. I
8  think we covered -- I mean, we had
9  two long benches in the ET shop.
10 We had -- when you have 12 ETs and
11 -- in that space, which was a
12 pretty good size for a ship, it
13 was just -- it was a place you
14 couldn't keep clean. Let me put
15 it that way.
16     MR. PAUL: All right. Well,
17 let's go off the video for a
18 minute because we have to change
19 the tape.
20     THE VIDEOGRAPHER: This
21 concludes video 1. The time is
22 12:16 p.m. We are off the record.
23     (Off the record.)
24     THE VIDEOGRAPHER: The time

1  is 12:26 p.m. This is the
2  beginning of video 2. We are on
3  the record.
4  BY MR. PAUL:
5      Q.  Okay. You were discussing
6  earlier the equipment that was in the
7  room. Okay? Are you able to -- today,
8  to remember a specific one of the
9  products that were -- that were on this
10 chart that were in the room?
11     And I'm excluding the radar
12 equipment for the moment.
13     A.  Yeah, we didn't -- because
14 we didn't bring the radar equipment in.
15     Q.  Right. Of course, not.
16 That's why I'm not asking about that.
17     A.  It's too big.
18     I really don't, but I can
19 say that our goal was to bring every
20 piece of electronic equipment we had in.
21 And even if we didn't do anything to
22 it -- if we'd just, for example,
23 maintained it, you know, the day before,
24 we would at least check the card and make

1 going to get to that in a minute.
2 Do you recall being exposed
3 to any particular ones of these products
4 or not?
5 DEFENSE COUNSEL: Objection;
6 form, vague, ambiguous, lacks
7 foundation, calls for speculation,
8 assumes facts not in evidence.
9 THE WITNESS: The answer is,
10 no, I really don't recall any
11 particular -- this was 50 years
12 ago, and I have to stretch to
13 remember some of the things I do
14 remember. It's one of the reasons
15 I did a lot of research.
16 BY MR. PAUL:
17 Q. Right. Well --
18 A. But I don't remember, you
19 know, which equipment. I just -- all I
20 know is all the equipment that Cambria
21 had on board that ship was at least
22 monitored and usually changed. But each
23 one of them was brought down to the ET
24 shop because everything was there for the

1 picking. We could take any piece of
2 equipment.
3 We actually -- during this
4 overhaul, we actually -- some of the crew
5 from the shipyard actually moved walls.
6 We changed some of the equipment around.
7 Some ended up going into the flag
8 officer's quarters -- or their offices,
9 which are up -- high up in the ship. But
10 every one of these pieces of equipment
11 was there for us to take because nobody
12 was using them. None of these people
13 were aboard. And that's why we were very
14 busy. And that was our function.
15 DEFENSE COUNSEL: Move to
16 strike the speculative and
17 nonresponsive portions.
18 BY MR. PAUL:
19 Q. You mentioned a radar?
20 A. Yeah.
21 Q. Is that a separate piece of
22 equipment that was not worked on in the
23 shop?
24 A. Yeah, it was too big. The

1 -- we had two radars, as I said.
2 DEFENSE COUNSEL:
3 Objection --
4 THE WITNESS: The air search
5 radar was very, very big.
6 DEFENSE COUNSEL: Objection;
7 overbroad.
8 THE WITNESS: It had -- it
9 was at the top of a mast.
10 Actually, I'll just take them one
11 at a time. That's the SPS 40. It
12 was at the top of a mast.
13 BY MR. PAUL:
14 Q. That's the SPS 40, you said?
15 A. The AN SPS 40.
16 Q. Okay.
17 A. At the bottom of the mast
18 was -- masts are huge on these ships.
19 Okay. They're hollow. They're steel --
20 was a door that you -- when you opened
21 the door -- and that's where the
22 electronic equipment for the SPS 40 was
23 located.
24 Similarly, the SPS 10, there

1 was another opening where that was
2 maintained, and that was on a different
3 mast. The SPS 40 was on one of the masts
4 on the front of the ship. The SPS 10 was
5 on one of the masts more near the center
6 of the ship.
7 But they each had the two
8 rotating antennas. There was a
9 transmitter and a receiver to transmit a
10 pulse, which would bounce off and then
11 the receiver would receive it and amplify
12 it. And it would show up on your -- the
13 scanner that we had, the oscilloscope. I
14 forget -- I forget the real name for the
15 screen that the people that were on board
16 -- CIC and ever who else -- we had what
17 we called repeaters, where they could
18 look, and they could see these blips, and
19 they could interpret them as whatever,
20 surface craft, aircraft.
21 DEFENSE COUNSEL: Move to
22 strike the nonresponsive portions.
23 BY MR. PAUL:
24 Q. Did you, yourself, work on

1  the electronic equipment in the SPS 10?
2      DEFENSE COUNSEL: Objection;
3  asked and answered.
4      MR. PAUL: No, that is
5  definitely not asked and answered.
6      THE WITNESS: No, I didn't.
7  The only time I can remember
8  working on one of the radars was
9  in the SPS 40.
10     The SPS 40, when it worked,
11 was a beautiful piece of
12 equipment. You could pick up a
13 target 300 miles, which is -- back
14 in -- I believe, in 1964, '65,
15 that was pretty phenomenal. But
16 it broke down all the time. And
17 it was the most modified piece of
18 equipment we had on the ship.
19     We had a field -- a field
20 rep who came out and helped get
21 that thing operating. If there
22 were field changes, updates that
23 were made -- and there were
24 several -- that's who would do it.

1      It was a very, very special,
2  state of the art in those days,
3  piece of equipment.
4      DEFENSE COUNSEL: Move to
5  strike.
6      THE WITNESS: And one
7  time -- I did go out at least
8  once -- but the captain was very,
9  very upset when that was down.
10     And so I was on the field
11 rep's back. If he was down there
12 in that little room working on the
13 radar system, I'd want to know
14 what the problem is, how long is
15 it going to take, do you have the
16 parts that you need to repair it,
17 and so forth, because -- just
18 because of the captain. It was
19 that and the other radar, the
20 surface search radar, were two
21 vital pieces of equipment that
22 they didn't want to be without.
23     DEFENSE COUNSEL: Move to
24 strike the nonresponsive portions.

1  BY MR. PAUL:
2      Q.  Do you remember who -- what
3  company the field representative worked
4  for, for the SPS 40?
5      DEFENSE COUNSEL: Objection;
6  leading, lacks foundation, calls
7  for speculation.
8      THE WITNESS: I want to say
9  Raytheon. I'd have to go back and
10 look. Because I actually found
11 documents that showed all the
12 different versions of the SPS 40
13 radar.
14     And I looked for the version
15 when I was on board, and it
16 definitely wasn't all solid state.
17 It was partially tubes. It had a
18 magnetron.
19     But I think we have -- in
20 our records there, we do have --
21 matter of fact, I could look on
22 here and see.
23     MR. PAUL: That's all right.
24 I'm not asking what you --

1      DEFENSE COUNSEL: Move to
2  strike speculation and
3  nonresponsive portions, improper
4  refreshing of recollection.
5      THE WITNESS: No, it was the
6  SPS 10 that was Raytheon. The SPS
7  40 --
8      DEFENSE COUNSEL: Improper
9  refreshing of recollection.
10     THE WITNESS: -- I think it
11 started out with Lockheed Martin,
12 but then when they -- the company
13 started to get sold and bought by
14 other companies. It changed
15 hands.
16 BY MR. PAUL:
17     Q.  So you were --
18     DEFENSE COUNSEL: Move to
19 strike speculation and
20 nonresponsive portions.
21 BY MR. PAUL:
22     Q.  How did you know that it was
23 a Lockheed representative on the SPS --
24     DEFENSE COUNSEL: Assumes

1    facts not in evidence --
2        MR. PAUL: Excuse me. I'm
3    not finished asking my question.
4    Could you please wait?
5    BY MR. PAUL:
6        Q.   How did you know? Did he
7    have a logo? Did he have a uniform? Did
8    he give you a business card? How did you
9    know?
10       DEFENSE COUNSEL: Same
11    objections.
12       THE WITNESS: He was the
13    only guy on board in civilian
14    clothes. How about that?
15       DEFENSE COUNSEL: Same
16    objections.
17       THE WITNESS: He was -- I
18    worked with him when he came on
19    board. He came to see me. I
20    mean, that was part of my
21    function. Okay? And so I knew
22    who he was.
23       He didn't get to our ship a
24    very easy way. Very often, he was

1    transferred from another ship or a
2    helicopter to get to us.
3    BY MR. PAUL:
4        Q.   Do you remember his name?
5        A.   It wasn't always the same
6    guy.
7        Q.   Oh, it was not always the
8    same guy?
9        A.   Yeah.
10        Q.   Well, so the SPS 40 wasn't
11    worked on just one time in your presence?
12    It was worked on more than once?
13        A.   Worked on a lot. Worked on
14    a lot.
15       DEFENSE COUNSEL: Objection;
16    leading.
17       THE COURT REPORTER: Can you
18    say -- I didn't hear your answer.
19       THE WITNESS: Oh, it was
20    worked on a lot, yeah. It was --
21    BY MR. PAUL:
22        Q.   How often was the
23    electronics worked on, on the SPS 40, in
24    your presence?

1       DEFENSE COUNSEL: Objection;
2    vague, ambiguous, overbroad.
3       THE WITNESS: Well, it was
4    only the one time that I know of
5    that I was down there when they --
6    BY MR. PAUL:
7        Q.   Okay.
8        A.   -- opened it up.
9        Q.   Okay. Were you ever in the
10    other parts of the ship, like the engine
11    room or the fire rooms?
12        A.   When I went aboard the ship,
13    I was given a complete tour. That
14    included the engine room.
15        Q.   Okay.
16        A.   And the one thing I learned
17    about the engine room is that I never
18    wanted to go back there again. It was
19    like 110 degrees and super dry. It's not
20    the kind of place you want to go.
21        Q.   Okay. I got you.
22        A.   We used -- but we used
23    cooling air from, like, in the winter,
24    for example --

1        Q.   Uh-huh.
2        A.   -- to help cool that part of
3    the ship.
4        Q.   Okay.
5        A.   In other words, it's part of
6    the ventilation system that we had which
7    was --
8        Q.   Was there any deck work or
9    insulation of pipe work done in your
10    vicinity?
11        A.   Not that I recall.
12        Q.   All right. Have we now
13    talked about everything that you did in
14    the Navy, or have we missed any jobs or
15    activities that you had in the Navy?
16        A.   Well --
17        Q.   We've talked about the watch
18    officer. Other than that -- and you
19    talked about that, as well as the
20    electronic work. Anything else other
21    than the electronic work and the watch
22    officer work that you can recall?
23        A.   Yeah. I'm not sure this is
24    really -- well, the other job I had was

MAGNA
LEGAL SERVICES

# EXHIBIT E

Reproduced from the Unclassified / Declassified Holdings of the National Archives

NAVSHIPS 92441.42

*Non-Registered*

# "APPROVED MANUSCRIPT"

# MAINTENANCE STANDARDS BOOK

## *for*

# RADIO SETS AN/SRC-13, -14, -15

SERIAL NO._____

OF MODEL_____

RCA SERVICE COMPANY

GOVERNMENT SERVICE DEPARTMENT

CAMDEN, NEW JERSEY

# DEPARTMENT OF THE NAVY

# BUREAU OF SHIPS

*Contract:* NObsr 71524

*Approved by BuShips:* 28 May 1958



DECLASSIFIED

Authority NND 974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

STEP (21Q)

AN/SRC Completely De-energized.

| STEP NO. | ACTION REQUIRED | PROCEDURE |
|---|---|---|
| (21Q) | Inspect the equipment for mechanical faults. | Inspect the ground clamp and ground straps for clean, tight connections. Clean and tighten cup insulators and bushings. Inspect the operation of the shock mounts. Inspect cables, plugs, connectors and receptacles for cracked or defective insulation. Straighten cable kinks and remove improper supports. Inspect the terminal boards (including terminal boards in junction box of mounting MT-327/GR, MX-1583/SRC (if used) and Control Box C-375/VRC). Clean corroded connections with crocus cloth. Inspect all switches for proper action, evidence of arcing and tight connections. Inspect all potentiometers for broken parts, loose connections and loose or missing control knobs. Inspect the mechanical tuning and detent assemblies for loose or broken parts and for dirt, rust or corrosion. Clean, tighten and replace all defective parts. |

| STEP NO. | 1st QUARTER | | 2nd QUARTER | | 3rd QUARTER | | 4th QUARTER | |
|---|---|---|---|---|---|---|---|---|
| | Initial | Date | Initial | Date | Initial | Date | Initial | Date |
| (21Q) | | | | | | | | |

| STEP NO. | 5th QUARTER | | 6th QUARTER | | 7th QUARTER | | 8th QUARTER | |
|---|---|---|---|---|---|---|---|---|
| | Initial | Date | Initial | Date | Initial | Date | Initial | Date |
| (21Q) | | | | | | | | |

DECLASSIFIED
Authority NND 974382

ORIGINAL

Reproduced from the Unclassified / Declassified Holdings of the National Archives

PART II – SEMIANNUAL

STEP (1S)



AT-252/SR

(1S)

(2S)

UG-2I( )/U

UG-2I( )/U

MEGOHMS

GROUND

RG-IO/U

DECLASSIFIED
Authority NND 974382

ORIGINAL

Reproduced from the Unclassified / Declassified Holdings of the National Archives

O.M. - Designates
Operational Maintenance

| STEP NO. | ACTION REQUIRED | PROCEDURE |
|---|---|---|
| (1S) O.M. | Inspect and clean the Antenna mast section and base. | Unscrew the mast section from the mast base. Clean each mast section and antenna cup insulators with soap and water. Remove all salt and soot deposits, rinse with clear water and dry thoroughly. Inspect the mast section for rust and corrosion, particularly at the threaded connector. Remove all foreign material with crocus cloth or by careful scraping. Remove the ground strap and the ground clamp at the Antenna cup insulator. Clean and replace parts as necessary for a clean, tight connection. Inspect the cable connector at the Antenna base. Remove all foreign matter that would prevent a good electrical connection. |

| STEP NO. | 1st HALF | | 2nd HALF | | 3rd HALF | | 4th HALF | |
|---|---|---|---|---|---|---|---|---|
| | Initial | Date | Initial | Date | Initial | Date | Initial | Date |
| (1S) | | | | | | | | |

DECLASSIFIED
Authority NND 974382

ORIGINAL

Reproduced from the Unclassified / Declassified Holdings of the National Archives

NAVSHIPS 91420.41

*Non-Registered*

"APPROVED MANUSCRIPT"
MAINTENANCE CHECK-OFF BOOK
*for*
SONAR SOUNDING SETS
AN/UQN-1B,    AN/UQN-1C

MODEL NO._____

SERIAL NO._____

RCA SERVICE COMPANY, INC.
GOVERNMENT SERVICE DEPARTMENT
CAMDEN, NEW JERSEY

Electronics Divisions
File Copy
Return to Code 991

DEPARTMENT OF THE NAVY
BUREAU OF SHIPS

*Contract: NObsr 63505*          *Approved by BuShips: 6 September 1955*

DECLASSIFIED
Authority NND 974382

Reproduced from the Unclassified / Declassified Holdings of the National Archives

① CLEAN EQUIPMENT

② INSPECT ALL CONTROLS



③

SONAR SOUNDING SET
CABINET DOOR OPEN

DECLASSIFIED
Authority NND 974382

ORIGINAL

Reproduced from the Unclassified / Declassified Holdings of the National Archives

Sonar Sounding Set de-energized
Front cover open

| STEP NO. | ACTION REQUIRED | PROCEDURE |
|---|---|---|
| (1) | Clean equipment. | Clean inside of cabinet with vacuum cleaner. Withdraw and invert Receiver-Indicator chassis and vacuum. All dirt must be removed from switches, terminal boards, and tube sockets. If all dirt cannot be removed by vacuuming use dry brush to loosen or remove deposits. Any remaining deposits are best removed with a clean lint-free cloth which has been moistened with Dry Cleaning Solvent 140-F Fed. Spec. P-S-661 type II (5 gal; SNSN G51-S-4718-10). <br><br> Corrosion must be removed whenever it becomes evident. Connectors, terminals, jacks, etc. can be polished with crocus cloth or #0000 sandpaper in especially stubborn cases. |
| (2) | General mechanical inspection. | Visually inspect the mechanical action of all controls. Clean with Dry Cleaning Solvent 140-F Fed. Spec. P-S-661 type II (5 gal; SNSN G51-S-4718-10) if sticking occurs. Check that all mountings and connections are tight. All shafts should rotate freely. All switches must be inspected for damage due to arcing. When it is necessary to burnish contacts use a burnishing tool. |
| (3) | General electrical inspection. | Note and replace charred wiring, burnt or discolored resistors, and bulged or broken capacitors. Inspect all cables and wiring for frayed, cut, deteriorated or cracked insulation, kinks or strains. |
|  |  |  |

| STEP NO. | Month | JAN 19__ | FEB 19__ | MAR 19__ | APR 19__ | MAY 19__ | JUNE 19__ | JULY 19__ | AUG 19__ | SEPT 19__ | OCT 19__ | NOV 19__ | DEC 19__ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | Initial |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Date |  |  |  |  |  |  |  |  |  |  |  |  |
| (2) | Initial |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Date |  |  |  |  |  |  |  |  |  |  |  |  |
| (3) | Initial |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Date |  |  |  |  |  |  |  |  |  |  |  |  |

DECLASSIFIED
Authority NND 974382

**DATE:** 1 July 1964

**ITEM NAME:** TRANSPONDER SET

**COGNIZANT SERVICE:** USN

**TYPE:** AN/UPX-12, * -12A, ** -12B***

FEDERAL STOCK NUMBER:

|  | USA | USN | USAF | USMC |
|---|---|---|---|---|
| STATUS OR TYPE CLASSIFICATION |  | Sub. Std |  |  |

Mfg(s) Name or Code Number: General Electric Company*; Radio Receptor Company, Inc.**



*Receiver-Transmitter RT-38?()/uPI-12*



*Decoder KT-200()/UPY-12*

## FUNCTIONAL DESCRIPTION

Transponder Sets AN/UPX-12, -12A, and -12B respond to appropriate interrogations from Radar Recognition Sets for the purpose of self-identification. They receive paired-pulse interrogation signals and transmit single-pulse identifying replies. Interrogations are pulse-pairs in one or more of three modes as determined by the spacing of the pulses in a pair. Replies to all modes are single, one-microsecond pulses.

## RELATION TO SIMILAR EQUIPMENT

Similar to the AN/UPX-5, -5A, and -5B equipments.

## TECHNICAL DESCRIPTION

Frequency: Receiver, 1010 to 1030 mc;
  transmitter, 1090 to 1110 mc
IF. Frequency: 59.5 +1.5 mc
Bandwidth: 8 to 11 mc at 6 db down
Duty Cycle: 0.1% while carrying pulses of 10-kw
  peak power
Minimum Output: 300w at 500 pps
Pulse Width: 0.9 to 1.3 -sec (50% of peak am-
  plitude)
Operating Voltages and Power Requirements:
  105 to 125v, 57 to 63 cps or 360 to 440 cps,
  1-ph, 398w approx

## INSTALLATION CONSIDERATIONS

Siting:
Mounting:
Cabling Requirements: Cables must enter the
  cases without sharp bends. Interconnecting
  cables between receiver-transmitter and de-
  coder must not exceed 20 feet. The antenna
  cable must not exceed 150 feet and other ca-
  bles should not exceed 300 feet in length.
Related Equipment:

**AN/UPX-12, -12A, -12B**

### PRINCIPAL COMPONENTS AND PHYSICAL DATA

| COMPONENT | QTY | HEIGHT (Inches) | WIDTH (Inches) | DEPTH (Inches) | UNIT WT. (Pounds) |
|---|---|---|---|---|---|
| AN/UPX- 12 | | | | | |
| Receiver-Transmitter RT-387/UPX- 12 | 1 | 15-1/2 | 18 | 28-3/8 | 141 |
| Decoder KY-200/UPX-12 | 1 | 10 | 18 | 26-5/8 | 101 |
| Video Coder KY-136/UPA-38 | 1 | | | | |
| Radar Set Control C-1047/UPA-38 | 1 | | | | |
| AN/UPX- 12A | | | | | |
| Receiver-Transmitter RT-387A/UPX- 12 | 1 | | | | |
| Decoder KY-200A/UPX-12 | 1 | | | | |
| Video Coder KY-136/UPA-38 | 1 | | | | |
| Radar Set Control C- 1047/UPA-38 | 1 | | | | |
| AN/UPX- 12B | | | | | |
| Receiver-Transmitter RT-387B/UPX-12 | 1 | | | | |
| Decoder KY-200B/UPX-12 | 1 | | | | |
| Video Coder KY-136/UPA-38 | 1 | | | | |
| Radar Set Control C-1047/UPA-38 | 1 | | | | |

### REFERENCE DATA AND LITERATURE

Technical Manual:
  NAVSHIPS 92820

AN/UPX-12:  2

EXHIBIT F

```
 1   WILLIAM T. COVALESKI,      : COURT OF COMMON PLEAS
     et ux.                     : PHILADELPHIA COUNTY
 2        Plaintiff (s)         :
                                :
 3        -vs-                  : MARCH TERM, 2003
                                :
 4   ALLIED CORPORATION,        :
     et al.                     :
          Defendant (s)         : NO. 4332
 5                        -   -   -
 6
 7              Videotape deposition of WILLIAM
 8   T. COVALESKI, taken pursuant to notice, held
 9   at the Sheraton Park Ridge Hotel, 480 N. Gulph
10   Road, King of Prussia, Pennsylvania 19406, on
11   Tuesday, May 20, 2003, beginning at or
12   about 11:20 a.m., before Wanda M. Barnum,
13   Court Reporter and Notary Public, and Robert
14   Higham, Videotape Operator, there being
15   present.
16                        -   -   -
17   APPEARANCES:
18              HOWARD, BRENNER & NASS
                BY:  EDWARD M. NASS, ESQUIRE
19              1608 Walnut Street
                17th Floor
20              Philadelphia, Pennsylvania 19103
                Phone:  (215) 546-8200
21              Representing the Plaintiffs
22              McCARTER and ENGLISH, LLP
                BY:  EVOLEA C. WATSON, ESQUIRE
23              Mellon Bank Center
                Suite 700, 1735 Market Street
24              Philadelphia, Pennsylvania 19103
                Phone:  (215) 979-3800
25              Representing Defendants,
                AO Smith, Owens-Illinois, Inc.
```

Page 14

1  the record or objection off the video? Or
2  speaking objection?
3      MR. NASS: I think for the
4  purposes of the video, if there's an
5  objection, I think we should go automatically
6  off the tape. We'll see how that goes there.
7  I try not to ask a lot of objectionable
8  questions, but --
9      A DEFENSE COUNSEL: Counsel, is
10  it your intention that instead of a
11  cross-examination on video, we will
12  incorporate by reference our discovery
13  deposition?
14      MR. NASS: Absolutely. I think
15  the rules permit that anyway for the discovery
16  deposition will be used as, you know, at
17  trial, however counsel wishes, but I'm
18  agreeing to that on the record, too, that you
19  don't need to repeat the questions on the
20  videotape that you've asked on discovery.
21      THE VIDEOTAPE OPERATOR: We're on
22  the video record.
23      This is a videotape deposition
24  for Court Common of Pleas, Philadelphia
25  County, Pennsylvania.

Page 15

1      My name is Robert Higham. I'm
2  the videotape operator. I'm employed by
3  Knipes-Cohen Spherion, Registered Professional
4  Reporters, 400 Market Street, Philadelphia,
5  Pennsylvania 19106.
6      The court reporter is Wanda
7  Barnum.
8      The caption for today's case is
9  as follows: William T. Covaleski versus
10  Allied Corporation, et al., March Term, 2003,
11  Number 4332.
12      This deposition is being taken on
13  behalf of the Plaintiff at the Sheraton Park
14  Ridge, 480 North Gulph Road, King of Prussia,
15  Pennsylvania.
16      Appearances are Edward N. Nass,
17  Esquire, attorney for the Plaintiff. All
18  Defense counsel will be reflected on the
19  stenographic record.
20      The Deponent today is William
21  Covaleski.
22      Today's date is May 20 2003. The
23  time is 11:21.
24      The reporter will now swear in
25  the witness.

Page 16

1      THE VIDEOTAPE OPERATOR: Off the
2  video record. The time is 11:22.
3      THE VIDEOTAPE OPERATOR: Back on
4  the video record. The time is 11:22.
5      The reporter will now swear in
6  the witness.
7      - - -
8      WILLIAM T. COVALESKI, after
9  having been duly sworn, was examined and
10  testified as follows:
11      - - -
12      EXAMINATION
13      - - -
14  BY MR. NASS:
15  Q.    Would you please state your full name
16  for the record?
17  A.    William Thomas Covaleski.
18  Q.    Good morning, Mr. Covaleski. As you
19  know, my name is Edward Nass, and I am
20  representing you in connection with this
21  matter.
22      Now right now the jury can see
23  you on this videotape but they cannot see me,
24  and they cannot see other counsel. But we're
25  all here today to take your testimony in

Page 17

1  connection with the claim that has been
2  brought by both yourself and your wife,
3  Dorothea, okay? Are you ready to proceed?
4  A.    Yes.
5  Q.    Okay. First of all, will you tell us
6  where it is that you live?
7  A.    I live at 3420 Waterstreet Road in
8  Collegeville, Pennsylvania.
9  Q.    All right. And about how long have you
10  lived in Collegeville?
11  A.    Thirty years.
12  Q.    And what is your age, sir?
13  A.    Seventy.
14  Q.    And can you give us your date of birth?
15  A.    9/22/32.
16  Q.    And where were you born in 1932?
17  A.    Mount Carmel, Pennsylvania.
18  Q.    What part of the state is that?
19  A.    It's in Butler Township.
20  Q.    Okay. Up sort of in the Poconos is
21  that?
22  A.    Not quite. It's northwest of there.
23  Q.    Okay.
24  A.    Towards the middle of the state.
25  Q.    Where did you end up going to high

5 (Pages 14 to 17)

Page 18

1  school?
2  A.  Northeast Catholic in Philadelphia.
3  Q.  All right.  How old were you when you
4  moved to Philadelphia?  Approximately how old
5  were you?
6  A.  Nine years old.
7  Q.  Did you end up graduating from high
8  school?
9  A.  Yes.
10  Q.  Mr. Covaleski, are you married?
11  A.  Yes.
12  Q.  And what is your wife's name?
13  A.  Dorothea.
14  Q.  And is she here in the room today?
15  A.  Yes, she is.
16  Q.  What year did you and Dorothéa get
17  married?
18  A.  1957.
19  Q.  So you've been married, I guess, 45, 46
20  years?
21  A.  Years.
22  Q.  Okay.  Do you have any children?
23  A.  Three.
24  Q.  Boys, girls?
25  A.  Two girls and a boy.

Page 19

1  Q.  How about you give us their names and
2  approximate ages?
3  A.  Suzanne Salmon, 46.  Lisa Windegrad,
4  45.  And William J. Covaleski, 40.
5  Q.  Any of your children here today with us?
6  A.  Yes.
7  Q.  Okay.  Who is with us?
8  A.  Suzanne Salmon.
9  Q.  You have three children.  Do you have
10  any grandchildren?
11  A.  Six.
12  Q.  Okay.  Mr. Covaleski, are you presently
13  employed or retired?
14  A.  I'm retired.
15  Q.  Okay.  When was it that you retired?
16  A.  1989.
17  Q.  And what company did you retire from?
18  A.  General Electric.
19  Q.  How long did you work for General
20  Electric all together?
21  A.  Approximately 32 -- 33 years.
22  Q.  So you've been retired now for 14, 15
23  years?
24  A.  Fourteen and a half years.
25  Q.  Okay.  Until recently, how was your

Page 20

1  health during your retirement?
2  A.  Fine.
3  Q.  Mr. Covaleski, how is your health at the
4  present time?
5  A.  Not too good.
6  Q.  Why not?
7  A.  I've been under treatment for cancer.
8  I've gone through forty treatments of
9  radiation and eight treatments of chemo.  And
10  this coming week I start back on chemo again.
11  Q.  What type of cancer do you have?
12  A.  Lung cancer.
13  Q.  And do you know in which lung you have
14  this cancer?
15  A.  Right.
16  Q.  Approximately when was it that you first
17  found out that you had the cancer?
18  A.  This past February.
19  Q.  That would be about three months ago?
20  A.  Three months ago.
21  Q.  Mr. Covaleski, will you tell the members
22  of the jury the events that led up to the
23  discovery of your lung cancer?
24  A.  I went to my primary physician somewhere
25  in January, and my complaint was that I was

Page 21

1  coughing up clear phlegm.  He knew that I had
2  an X-ray done two years previously and it
3  showed a touch of emphysema.  So he just blew
4  it off as a touch of emphysema.
5  Couple weeks later I went back to
6  him.  And, according to him, I have an
7  infection in my lung, which I was coughing up
8  green and yellow phlegm.  He gave me
9  antibiotics, and that went on for about three
10  weeks and that cleared up, but I was still
11  coughing up clear phlegm.
12  I went back to him.  He suggested
13  I get an X-ray.  And I had one two years
14  before that and it didn't show anything.  And
15  here the X-ray indicated a dark spot on my
16  lung.  So he suggested I have a CAT scan.
17  I had the CAT scan, and that
18  showed definitely I had possibly cancer.  So
19  arrangements were made for me to go to Fox
20  Chase Cancer Center, which four doctors
21  examined me and diagnosed that, yes, I had a
22  tumor on my lung and I -- it spread up to my
23  lymph nodes in my neck.
24  Q.  Mr. Covaleski, when you were first told
25  that you did in fact have cancer, what was

Page 30

1  asbestos with Igo?
2  A.  No, I think that's about it.
3  Q.  What was your next job after Igo?
4  A.  I went with General Electric.
5  Q.  Okay. And when was it that you started
6  with General Electric?
7  A.  1956.
8  Q.  Do you remember the month?
9  A.  Yes, November.
10  Q.  And is General Electric the company that
11  you stayed with until you retired?
12  A.  Yes.
13  Q.  And I believe you told us --
14  A.  Thirty-two years.
15  Q.  And you retired in 1988?
16  A.  Correct.
17  Q.  So we have '56 to '88?
18  A.  Yeah.
19  Q.  Now, in November of 1956, which General
20  Electric plant did you work at?
21  A.  At the Space Division. It was a brand
22  new division. It was the beginning of the
23  space industry at 32nd and Chestnut.
24  Q.  Okay. I guess this was right around the
25  time that Russia put Sputnick up, right?

Page 31

1  A.  Yeah.
2  Q.  Okay. And that General Electric plant
3  you said was at what address?
4  A.  32nd and Chestnut Street.
5  Q.  Is that plant still there today?
6  A.  No. They moved out of there ten years
7  ago and it was sold and I think it's
8  condominium apartments.
9  Q.  How long did you actually work at the GE
10  plant at 32nd and Chestnut?
11  A.  Twelve years.
12  Q.  Until what year? You started in '56
13  there.
14  A.  About '68, I guess.
15  Q.  What was the size of the GE plant at
16  32nd and Chestnut?
17  A.  It was a city block by two city blocks
18  by ten stories high.
19  Q.  And what were they actually making at
20  this space division plant when you were there?
21  A.  Nose cones for the missiles.
22  Q.  When you started at General Electric in
23  November of 1956, what was your first job?
24  A.  Pipe fitter.
25  Q.  And how long did you work as a pipe

Page 32

1  fitter at that GE plant?
2  A.  Approximately five years.
3  Q.  That takes us up to what year?
4  A.  '61.
5  Q.  During those five years that you worked
6  as a pipe fitter at General Electric,
7  generally speaking, can you tell the members
8  of the jury what your duties were?
9  A.  The building was supplied with steam
10  heat. And all steam pipe is covered with
11  insulation, specifically with asbestos
12  insulation. And that's three days out of five
13  days I worked on the steam lines because I was
14  either repairing or replacing or maintenance.
15  Q.  Where were these steam lines in the
16  facility?
17  A.  They ran through -- there was a sixteen
18  inch line that came in the building supplied
19  by Reading Railroad. And then it branched off
20  throughout the whole building. All the
21  perimeters had wall radiators. And then when
22  they were installing air conditioning through
23  the whole building, each unit, which is
24  approximately twenty ton units throughout the
25  whole building, were supplied with steam coils

Page 33

1  in there for heating.
2  Q.  And as a pipe fitter at General Electric
3  specific to this piping that ran throughout
4  the plant, what were your duties?
5  A.  Repairs, replacements, installation.
6  There was always constant work on it. And you
7  pulling off the insulation and then you would
8  always patch it back up again. Or
9  installation, if you ran a new line, you would
10  automatically insulate it.
11  Q.  Did you work on anything else there
12  other than piping systems?
13  A.  Yeah, plumbing.
14  Q.  Did you work on any equipment, any types
15  of equipment at the General Electric plant?
16  A.  Yes.
17  Q.  As a pipe fitter?
18  A.  Yes.
19  Q.  Give us some examples of the type of
20  equipment.
21  A.  Temperature, humidity chambers, which
22  were pipe with water glycol. Anything that
23  kept water or what have you going through it.
24  Q.  Mr. Covaleski, in connection with your
25  five years of work at the General Electric

9 (Pages 30 to 33)

Page 34

1  plant as a pipe fitter between 1956 and 1961,
2  were you exposed to any asbestos dust from any
3  asbestos-containing products?
4  A.  Quite a bit.
5  Q.  All right. And can you describe to the
6  members of the jury generally speaking how you
7  would be exposed to asbestos in connection
8  with this work?
9  A.  First of all, with the asbestos
10  covering. And most of the asbestos covering
11  was made by --
12      MS. WATSON: Objection.
13  BY MR. NASS:
14  Q.  You can't tell us right now the
15  manufacturer's name. We'll get to that
16  later. Go ahead.
17  A.  It was pipe insulation. They called it
18  half moon. And it came in various sizes, from
19  half inch all the way up to sixteen inch. And
20  there was a specific spot in the building, it
21  was the penthouse on a roof they stored it
22  because of the dust problem. And when the
23  material came in receiving, they took it right
24  up to the roof, and that's where it was
25  stored, and they had racks with all different

Page 35

1  sizes. And then they had fifty-five gallon
2  drums and they had skids of loose asbestos,
3  which you would tear open the bag and then
4  dump it into the fifty-five gallon drum. And
5  any time you had to mix some up, you would
6  just get a two and a half gallon bucket and
7  scoop out whatever you needed. And the floor
8  was always covered with dust.
9  Q.  Going back to that half moon insulation
10  that you were describing -- first of all, how
11  do you know that that product was made of
12  asbestos?
13  A.  It was an unwritten law in pipe fitting
14  that anything that you had to do with steam
15  had to have asbestos covering for the
16  insulation purposes.
17  Q.  Any other reasons that you know also
18  that that pipe covering contained asbestos?
19  A.  From day one it was the only thing
20  available.
21  Q.  Okay. The -- would you personally
22  handle the pipe covering?
23  A.  Oh, yeah.
24  Q.  And would you have to do anything with
25  that pipe covering before you installed it?

Page 36

1  A.  Cut it, fit it, mix up the loose
2  asbestos for all the fittings and joints.
3  Q.  What would you cut the half moon pipe
4  covering with?
5  A.  Saw.
6  Q.  All right. And what would happen when
7  you sawed the pipe covering?
8  A.  All kind of dust.
9  Q.  Would you breathe in that dust?
10  A.  Yeah. Never had masks.
11  Q.  You mentioned also the loose form of
12  asbestos. What was that actually used for by
13  pipe fitters?
14  A.  To cover the joints.
15  Q.  All right. And joints are what?
16  A.  The elbows and the T's.
17  Q.  Are you referring -- when you refer to
18  elbows and joints and T's, are those parts of
19  a piping system?
20  A.  Piping system, yes.
21  Q.  And did you personally mix loose
22  asbestos?
23  A.  All the time.
24  Q.  All right. And what would happen
25  when -- did that product come dry or premixed?

Page 37

1  A.  Dry.
2  Q.  And what would happen when you mixed the
3  dry substance?
4  A.  It would just be so flaky. It would
5  just carry right through in the air.
6  Q.  In connection with your work as a pipe
7  fitter at General Electric, were there any
8  other types of asbestos-containing products
9  that you personally handled other than pipe
10  covering and loose asbestos?
11  A.  Gaskets.
12  Q.  Okay.
13  A.  Sheet gaskets, pre-punched gaskets.
14  Most of your fittings three inches and over
15  were all flange gaskets and you would have
16  premade gaskets, four hole, six hole, whatever
17  the diameter and whatever the arrangements of
18  the bolts were. Sometimes we would punch out
19  our own gaskets. In most cases they would be
20  premade pre-punched gaskets.
21  Q.  And the gaskets were used where?
22  A.  On the fittings where they bolted them
23  together. You had two flush surfaces, and the
24  gasket went in between to prevent it from
25  leaking.

Page 38

1   Q.  We've talked about pipe covering. We've
2 talked about loose asbestos. We've talked
3 about gaskets. Any other types of
4 asbestos-containing products that you
5 personally handled?
6   A.  Gaskets themselves for different type
7 pumps, different type connections.
8   Q.  Anything else that comes to mind right
9 now?
10   A.  String gasket, rope gasket. Any time
11 you took a pump apart, obviously you replaced
12 all the gaskets and replaced all the packing
13 in there because you wouldn't reuse it again.
14   Q.  The -- tell me what this pipe product
15 looked like.
16   A.  It came in different diameters and
17 strings. It was like a rope. That's why they
18 called it. And then it was like an eighth of
19 an inch in diameter. So if you were packing
20 something and it was an eighth of an inch
21 opening, you would just take one string and
22 wrap it around until you got that area of
23 packing material to where you want it. And
24 then you would connect whatever connection it
25 was to it.

Page 39

1        If it were thicker than that half
2 inch -- in most cases if you had like
3 three-eighth or half inch, you'd get the
4 regular packing material three-eighth or half
5 inch by three-eighth -- half by half or half
6 by three-eighths. But if not, you could use
7 the rope material and wind it up and then pack
8 it in there.
9   Q.  All right. Going back to the gasket
10 material you're talking about, you were
11 talking about the sheet form of gasket. What
12 would you have to do with the sheet form of
13 gasket?
14   A.  You would cut it to the size, whatever.
15 Like say it's a six inch value, and you would
16 cut a piece approximately eight inches or so.
17 And if you had the valve there or something
18 there, you could actually put it over and just
19 with a ball peen hammer go around the edges
20 inside and outside and all the bolt holes and
21 just keep on tapping and -- otherwise, we had
22 tools, different diameters for cutting the
23 gaskets.
24   Q.  And what would happen when you would cut
25 the gasket material?

Page 40

1   A.  It would actually flake off.
2   Q.  All right. And would you be exposed to
3 that?
4   A.  Oh, definitely.
5   Q.  The -- going back now to the rope
6 material and this string material, would you
7 have to ever cut that?
8   A.  Yes.
9   Q.  All right. And what would you cut that
10 material with?
11   A.  With a knife.
12   Q.  And what would happen when you cut the
13 rope material?
14   A.  Same way. It would fray at the ends.
15   Q.  You've taken us up to as a pipe fitter.
16 What happened in 1961?
17   A.  I was promoted to foreman on second
18 shift.
19   Q.  Still at the same plant?
20   A.  Still at the same plant.
21   Q.  All right. And as a foreman, who were
22 you supervising?
23   A.  I was supervising plumbers, pipe
24 fitters, electricians and carpenters.
25 Complete maintenance group.

Page 41

1   Q.  All right. And how long did you work as
2 a foreman of the maintenance group at that GE
3 plant?
4   A.  Approximately seven years.
5   Q.  And what were your day-to-day duties as
6 a foreman?
7   A.  Supervising all the maintenance and
8 repairs, get work orders, start the shift,
9 hand the work out. And then during the night,
10 we would go around checking on the jobs to
11 make sure everything is running smooth.
12   Q.  Now, during that seven-year period that
13 you worked as a foreman, were you exposed to
14 any asbestos dust from any asbestos-containing
15 products?
16   A.  Yeah, when the pipe fitters were working
17 on steam lines, which it seems every night
18 there was a job -- a repair job of some sort.
19   Q.  The -- during that period from '61 to
20 '68, were you doing any hands-on work or were
21 you doing all supervision?
22   A.  No.
23   Q.  So then --
24   A.  All supervision.
25   Q.  All right. So during that period, you

11 (Pages 38 to 41)

Page 42

1  would have not been personally handling the
2  asbestos yourself?
3  A.  Correct.
4  Q.  Okay.  In terms of the types of asbestos
5  that your crew was using, was it similar or
6  different than what you used as a pipe fitter?
7  A.  Exactly the same thing.
8  Q.  Where did you go to work for General
9  Electric in 1968?
10  A.  I was transferred up to Valley Forge.
11  Q.  And how long did you end up staying at
12  the Valley Forge facility all together?
13  A.  Eighteen years in this one building.
14  Q.  When you retired, were you working out
15  of Valley Forge?
16  A.  No.  Yes, in Valley Forge, but I was in
17  another building because it was the end of the
18  coal war and we were making nose cones for the
19  minuteman missile in that plant.
20       So, at the end of the coal war,
21  the government stopped making minuteman
22  missiles.  So the plant -- the contract was
23  cancelled and the plant closed.  And then I
24  went to another building for approximately
25  two, three years before I retired.

Page 43

1  Q.  What kind of work did you do up at
2  Valley Forge during this 1968 period to 1988?
3  A.  I was a supervisor.  I had three foremen
4  under me.  So --
5  Q.  And once you got up to the Valley Forge
6  facilities, were you exposed to any more
7  asbestos?
8  A.  No, no more asbestos.
9  Q.  Mr. Covaleski, besides your regular work
10  with Igo that you've told the jury about and
11  then with General Electric, did you ever do
12  any moonlighting or work at any second jobs?
13  A.  Yes.
14  Q.  Tell the members of the jury about
15  that.
16  A.  This was approximately at the time where
17  all the boilers and all the heat in
18  Philadelphia was coal heat, and most of the
19  houses were heated by coal, hot water
20  boilers.  And that's when they came out in
21  '46, '47 with gas boilers.  So the trend was
22  to get rid of all the coal.  Nobody wanted the
23  coal anymore.  So they were all replacing coal
24  furnaces with gas.  So being that that's what
25  I was doing, I start working on the side on

Page 44

1  weekends replacing coal-fired boilers with
2  gas-fired boilers.
3  Q.  All right.  Were you doing this work
4  with anyone or just --
5  A.  Yes, a friend of mine.
6  Q.  What was your friend's name?
7  A.  Dan Friel.
8  Q.  All right.  And for -- and what decade
9  are we talking about?
10  A.  We're talking about '52 to '58.
11  Q.  All right.  And the -- how many furnace
12  jobs would you do doing the side work on a per
13  year basis during that '52 to '58 --
14  A.  Usually we started around April, May
15  after heating season.  And I would say we
16  would do one a week for -- up until October.
17  Q.  All right.  Now, in connection with the
18  installation -- the replacement of these coal
19  furnaces and the installation of these new
20  furnaces, were you exposed to any asbestos
21  dust from any asbestos-containing furnaces?
22  A.  All the coal, and they had some oil
23  burners, all of them were completely covered
24  with asbestos plastered on there.  And to get
25  the boilers out we had to bust them apart.  So

Page 45

1  we would just tear off all the insulation and
2  all the boilers were cast-iron heavy.  And we
3  just sledge hammered them apart and then the
4  scrap man would come in and take it out.
5  Q.  Now, you've told us about exposure that
6  you had on your regular job.  You told us now
7  about some exposure that you had in connection
8  with the side work.
9       Were you ever exposed to asbestos
10  in any other ways off the job?
11  A.  Yes.
12  Q.  How?
13  A.  Working on cars.
14  Q.  How were you exposed to asbestos working
15  on cars?
16  A.  Replacing the brakes.  Most of the time
17  that's where I was exposed to it.
18       THE VIDEOTAPE OPERATOR:  One
19  moment, please.  Off the vide record.  The
20  time is 11:57.
21       THE VIDEOTAPE OPERATOR:  Back on
22  the video record.  The time is 11:57.
23  BY MR. NASS:
24  Q.  How old were you when you started
25  changing brakes on automobiles?

# EXHIBIT H



ROBERT J. KRAUS and
MARGARET M.KRAUS, h/w

                       Plaintiff,                  Index No. 18-2119

     -against-                            **EXPERT AFFIDAVIT**

ALCATEL-LUCENT, ET AL,               **ASBESTOS CASE**

                  Defendants

---

STATE OF WASHINGTON   )
                        ) SS:
COUNTY OF KING         )

Arthur W. Faherty, being duly sworn upon his oath deposes and says:

1. I have been employed for many years in the fields of U.S. Navy equipment, and in the applications of U.S. Navy requirements under military specifications, usually referred to as mil specs and the issuances of the Secretary of the Navy and his designees and assignees and subordinates.
2. I am familiar with procedures for both new construction and repair of Navy and commercial vessels.
3. A copy of my CV is attached hereto and incorporated herein by reference as Exhibit A.
4. I have considerable experience in the interpretation of military and Navy documents.
5. I am aware of the Navy specification for the equipment for World War II era ships and later, known as General Specification for Machinery Sub S1-1 page 2.
6. These specifications required warnings and safety precautions.
7. I am aware of the Specifications for Shipyard Contracts.
8. I am familiar with MIL-M-15071, which was the military specification and its successors, including 15071A-C and the specifications referenced in paragraph 5 of that document. MIL-M-15071A-D is roughly the same and involves similar requirements.
9. 15071 states that the intent of the Navy was to accept the usual commercial manuals when roughly equivalent to the overall requirements of Navy.
10. Mil Spec 15071-D was later succeeded by MIL-15071E.
11. 15071D required submission of the manual to the Bureau of Ships which would then adopt the manual as a Navy document.
12. 15071D required manuals to contain safety precautions. (Section 3.1.9)

13. 15071D required that all manuals must contain notes, cautions and warnings to emphasize critical instructions. (Section 3.3.6)

14. Included in 3.3.6 (c) is the definition of the term "warning" which is defined by the Navy as operating procedures and practices which will result in personal injury or loss of life if not correctly followed.

15. 15071D Section 3.1.7 requires instructions to include precautions.

16. I am familiar with the duties of EMO (Electrical Material Officer) and of the ET ratings, seaman through CPO (Chief Petty Officer).

17. Plaintiff served on board the USS Cambria, as EMO from July 1964 to May 1967.

18. I have reviewed the following documents:

    a. 180823 and 190415 Alphabetic list of Cambria Electronic Equipment

    b. Electronics Material Officer Course Information

    c. Electronic Technician 3 Training Course

    d. Maintenance check-off Book for AN/GRC-2

    e. Maintenance Standards for Range-Azimuth Indicator, AN/SPA-4A, RCA, Navships 91825.42

    f. Maintenance Check-Off Book for Indicator Group SPA-8, 8A, 9, Navships 91411.41

    g. Maintenance and Check-Off book for Radio Sets AN/SRC 13, -14, -15, Navships 92441.42

    h. Maintenance Check-Off Book, AN/SRC-10, 10X, 10Y, 11, 11X, 12, 12X, 12Y, and AN/URC-16, 16X, 16Y, 17, 17X, 17Y, 18, 18X, 18Y, Navships 92755.41

    i. Maintenance Check-Off Book, Radio Receiving Sets. AN/SRR-1, 12, 13, Navships 91875.41

    j. Maintenance Check-off Book, Radio Transmitting Sets, AN/SRT-14, -15, -16, Navships 92121.41

    k. Maintenance Check-Off Book, Sonar Sounding Sets, AN/UQN-1B, -1C, Navships 91420.41

    l. Schedule for FRAM Mark II Sea Trial and Material Inspection, USS Cambria, 2 June 1963

    m. Material Inspection, USS Cambria, 20 May 1957

    n. Radio Interference Report, 20/27 July 1963, (date 1 August 1963) USS Cambria

    o. Maintenance Check-Off Book, Radio Transmitting Equipment Navy Model TED Series, Navships 91357.41

    p. (NOTE - All of the above were pages, not complete documents)

    q. Deposition of Robert J Kraus, 27 November 2018, 28 November 2018, 8 January 2019, 9 January 2019 with Exhibits

    r. Exhibit P5, 17 pages

    s. Gossett Notice of Deposition

    t. Landrum Notice of Deposition

    u. Deposition of Roger Gossett, 20 August 2019 with Exhibits

    v. Deposition of Joe R. Landrum, 13 August 2019, with Exhibits

19. Plaintiff Kraus, as EMO, (Officer) was not charged with physically doing work on equipment on board the USS Cambria. Physically working on the equipment was the task of the ETs. (Enlisted)

AWP

20. Plaintiff Kraus, as EMO, was in charge of the Electronic Technicians who worked on the communication and technical (Radar, Sonar, etc.) equipment on board in every location except the engine room.

21. Kraus, as EMO, had to understand the repair issues sufficiently to explain the maintenance/operational/failure issues to the chain of command (senior officers) on the vessel.

22. To accomplish Item # 21, from testimony, Kraus was frequently/constantly/in and out constantly, (verbiage from deposition testimony) around when the electronic equipment was being worked on either in the electronic repair shop or on location of radar repeaters. (The repeaters are the stand that includes the radar screen and electronic controls including capacitors and resistors, for adjustments for the radar screen.)

23. The fan in the electronic repair shop was "always" on, causing air and dust to circulate.

24. From testimony, transmitters, receivers, radios, radars, etc. contained many capacitors and resistors which resulted in high heat.

25. From supplied documentation, US Patents and Navy Specifications and letter, the resistors and capacitors contained asbestos paper for insulation and dielectric properties. (This was prevalent until the late 1960's when Nomex 410 was introduced.)

26. The Navy, in a 5 January 1979 letter to the General Accounting Office noted that asbestos was common in resistors and capacitors on all Navy ships.

27. From testimony, this paper, after use and due to heat, was easily torn, creating dust.

28. Deposition testimony includes opening of radars and antennas.

29. Asbestos gaskets were used on the antenna and radar systems, including SPS-6.

30. Typically the wires used on Navy and commercial ships through the late 1960s contained asbestos in the insulation.

31. Radars have multiple input and output signals that use wiring that terminates in the radar stands.

32. Under conditions of heat, the insulation deteriorates and becomes dusty, and the cooling fans move the resultant dust throughout the radar stands.

33. Testimony of witness shows plaintiff Kraus was close to the equipment with dust, and likely exposed to asbestos dust.

34. I am also familiar with Department of Navy Sec Nav 62603.5 later Sec. NAV 5700.5 dated 1956.

35. This document is also known as Uniform Labeling Program for Hazardous Industrial Chemicals and Materials, hereafter Uniform Labeling Program and was in place when the Plaintiff entered the Navy.

36. The Uniform Labeling Program was designed to standardize labeling requirements for hazardous products and provide labels to contain pertinent information to warn users of potential dangers.

37. The Uniform Labeling Program applied to labeling of all hazardous materials throughout the Navy.

38. The Uniform Labeling Program was not designed to govern the type of warning labels.

39. The Navy stated that the type of labels were to be governed by state and federal laws and regulations.

40. The Uniform Labeling Program noted that development of new products makes it mandatory that precautions should be taken including warning labels. (Section 3)

Aut

41. For poisons, a skull and cross bones was to be affixed.
42. Poison is defined as a substance with an inherent property that tends to destroy life or impair health. Asbestos is therefore a poison.
43. Paragraph 1.C of Uniform Labeling Program defines a Class III toxic hazard as any industrial or military material which may be given off a harmful, vapor, dust, fume or mist during handling or operation. The injurious effect may arise from one exposure (acute) or repeated exposures over a prolonged period (chronic). The mode of entry into the body maybe by ingestion, inhalation or absorption through the skins.
44. Paragraph 2.a. of the Uniform Labeling Program refers to the Warning Labeling Guide published by the Manufacturing Chemists Association.
45. This Guide, first published in 1946, requires precautionary labels for harmful dust. The reference to the guide shows the Navy's constant concern for warnings of hazards like asbestos.
46. Thus, by the time Plaintiff began his service in Norfolk in July 1964 the Navy required warnings of the hazards of asbestos in equipment for ships and that all claims that the Navy would have barred or prevented warning labels are untrue.
47. It is clear from these documents that the Navy wanted the warnings to reach Navy personnel on board the vessels and civilian personnel working on Navy ships, such as Plaintiff.
48. The Navy required manufacturers not only to warn on the products but to supply manuals containing warnings to each ship and precautions for use of the product.
49. Thus, when defendants sold products for use on ships that lacked warnings that met state and federal standards and/or the standards of the Manufacturing Chemists or the American Conference of Government and Industrial Hygienists this was in violation of specific Navy directions and requirements.
50. Rather than barring warnings, the Navy encouraged warnings, and the failure to warn of the hazards of asbestos violated Navy requirements.
51. The failure to include warnings and safety precautions in their manuals of their equipment violates specific Navy requirements.
52. The claim that the Navy would have barred warnings is thus false and without basis.
53. The Navy was well aware of the health hazards from asbestos exposure from at least 11 March 1941 and knew of discussions about the health hazards of asbestos exposure since 1939.
54. Asbestos was generally required on all high heat applications.
55. In many cases the suppliers of such equipment usually supplied asbestos product with/on/in their equipment.
56. Suppliers of equipment to the Navy were engaged by the Navy to participate in renovation and overhaul of their own equipment, or that of others, including asbestos containing parts in shipyard repairs.
57. Suppliers of equipment frequently supplied replacement asbestos or disturbed previously supplied asbestos as part of their activities on ships.
58. I expect to testify, at trial, on what the Navy archive records show about equipment supplied to the vessel, or vessels at issue, and what the records show as individual defendants supplying original or replacement asbestos containing equipment or disturbing asbestos.

59. Generally, if a company supplied asbestos with its equipment, some of that asbestos was always present unless the record shows that the asbestos installed by the defendants was entirely removed.

60. The removal of the entire initial asbestos never occurred.

61. I cannot comment, in this affidavit, as to specific defendants whose material I have not yet examined, but will supplement my testimony at trial by reliance on the documents from the archives.

62. From testimony there were no warnings of asbestos in the training manuals for the electronic equipment on the USS Cambria.

63. From testimony, ET's were not aware of asbestos in electronic equipment during their time on board the USS Cambria.

64. From testimony, the USS Cambria underwent an overhaul that included removal and renewal of asbestos insulation on the bulkheads outside the Electronic Shop.

65. I cannot comment, in this affidavit, as to specific defendants whose material I have not yet examined. However, it is clear that asbestos was present in electronic equipment.

66. I am also prepared to discuss the use of asbestos on Navy ships.

67. I reserve the right to amend this affidavit if I am provided more information.

Sworn to and subscribed
Before me this 14th day
of October, 2019

N S BAE
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
APRIL 10, 2022

_____
NOTARY PUBLIC

_____
ARTHUR W. FAHERTY



## ARTHUR W. FAHERTY, CMI
### Marine Engineer and Mechanical Expert

Experienced in the installation, testing, start-up, safe operation, maintenance, modification, troubleshooting, upgrade and repair of marine and industrial machinery, equipment and systems.

**Manufacturing Processes**: General machining, welding, brazing, grinding soldering, oxyacetylene cutting, aligning, shrink fitting, liquid and dry filling, dry solids handling, slurry handling, liquid handling paint preparation, painting, hot tapping.

**Manufacturing Procedures, Standards, and Specifications**: Pressure vessels, power piping, high-pressure air compressors, low-pressure air compressors, pipe welding, structural welding, drawing standards, hazardous area requirements, electrical generation and switchboards, failure analysis.

**Test Methods and Specifications**: Hydrostatic testing, vibration testing, static and high speed dynamic balancing, material specifications.

**Engineered Systems**: Steam; condensate-steam and motor plants; condensate-landfill; feedwater; liquid fuel; natural gas; methane collection; potable water; refrigeration; salt water service; ballast; tanker cargo; fire protection; waste water; hydraulic power; pneumatic power; pneumatic controls heating; ventilation and air conditioning; bag houses; sludge; oily water; sewage; cleaning and repair of tank farm pipelines, tanks and pumps.

**Machinery**: Diesel engines, fuel injection equipment, high speed centrifuges, compressors, heat exchangers, refrigeration compressors, absorption and centrifugal chillers, liquid and gas fired boilers, cooling towers, air handlers, valves and fittings, turbines, turbochargers, jib cranes, monorail cranes and hoists, winches and capstans, cargo machinery, bridge cranes, industrial scales, milling machines, lathes, presses, screw conveyors, belt conveyors, roller conveyors, drive gears, clutches, distillers, reverse osmosis, spreader beams, lifting and rigging gear, horse drawn machinery, farm tractors, vactors and industrial vacuums, elevators (passenger and freight), fuel oil blending, steering gears, hydraulic rams, rotating machinery, pumps (centrifugal, reciprocating, progressive cavity, positive displacement, screw, pneumatic).

**Machinery Safeguarding**: Safety interlocks, failsafe modes, caution and warning signs, machine guards, drive guards, instruction manuals, controls, damage control and damage control methods.

**Safety Procedures and Requirements**: Material Safety Data Sheets, right-to-know, confined space entry, lockout/tagout, scaffolding, training policies, inspections, OSHA requirements, industrial cranes – shipboard, shoreside, shipyard.

**Tools**: Drill press, lathes, milling machines, table and radial arm saws, rotary pneumatic drills, impact wrenches, nail guns, high pressure water blasters, high pressure washers, hand tools.

**Wharfinger**: Duties and responsibilities.

**Products**: Bicycles, motorboats - gas and diesel (operation, maintenance, and repair), Alpine and Telemark skis, rope tows.

**Regulatory Compliance**: American Bureau of Shipping, DnV, IACS, IMO, ISM, Marpol, U.S.C.G., OSHA.



**Robson Forensic**

ARTHUR W. FAHERTY, CMI
Marine Engineer and Mechanical Expert

**Specialized**: Graving docks, floating drydocks, marine railways, shipboard automation, shipyard contracts, assessment of marine operations, U.S.C.G. License Chief Engineer Unlimited Horsepower – Motor, Third Assistant Engineer-Steam, stability/inclining experiments, marine bulkheads.

## PROFESSIONAL EXPERIENCE

2006 to present
**Robson Forensic, Inc.**
*Area Manager for Seattle Area*                                        2009-present
*Area Manager for Upstate/Eastern New York and Vermont*      2006-2009
Provide technical investigations, analysis, reports, and testimony towards the resolution of commercial litigation cases and personal injury cases involving commercial vessels and pleasure craft.

1996 to present
**Arthur Faherty**
*Consultant, Port Engineer*
Work includes direct involvement with nuclear industry for safe operation of standby generators for shaft alignment, vibration problems and root cause analysis; troubleshooting large centrifugal machines for environmental clean-up in South America and purifier operations. Design work with naval architecture firm including work on installing additional engine on dynamic positioning drill vessel. All phases of shipboard operations – machinery, cargo, regulatory, human resources. Worked with German Engineering firm to market digesters for animal waste to farmers in western United States. Instructed Pipeline Hydraulics for COTCO (Cameroon Oil Transportation Company, a division of ExxonMobil), Pipeline Operators. Field Supervisors, and Pipeline Engineers for 1100 KM pipeline for pumps, pumping, hydraulic surges, system operation, testing and maintenance (Douala, Cameroon; September 2013 – July 2014).

2013 to 2014
**Robert Allan, Ltd.**
*Lead Marine Engineer*
Lead Engineer for conversion of tanker to FSO for Gulf of Thailand.

1988 to 2006
**U.S. Merchant Marine Academy, Global Maritime and Transportation School**
*Visiting Professor*
Areas of expertise and instruction include vibration training for nuclear power plants, shipboard propulsion systems (steam and diesel), rotating machinery (reciprocating and centrifugal pumps, centrifugal and reciprocating air compressors, centrifugal and reciprocating AC compressors, purifiers), piping systems, refrigeration, including ammonia, HVAC systems, low pressure and high pressure boiler control systems, waste treatment systems, evaporators and reverse osmosis units, Marpol regulations, Classification Society rules and regulations, electrical distribution and switchboards systems (480 and 5kV), shipboard management, shipyards, shipboard automation systems, simulation training, and failure analysis.



# THE EXPERTS
# Robson Forensic

## ARTHUR W. FAHERTY, CMI
### Marine Engineer and Mechanical Expert

Programs include Ship of the Future for the U.S. Navy, MARAD Inspectors, ABS Surveyors, Diesel Engine Training for Exxon, Military Sealift Command, ARCO, License Upgrade, Diesel Generator performance for public utilities, U.S. Army Reserve Training for vessel operations, shipyard course for U.S. Navy reserve units, National Sealift Training for Engineers (both for Superintendent Engineers and for operating personnel) for hull surveys, engine room surveys and breaking out the plants and QMED program for MSC. Courses are developed using the IMO model for classroom instruction. Co-authored assessment of Staten Island Ferry System resulting in reorganization of system to reflect shipboard safety and operating standards.

| 2004 to 2005 | **M.V. Cape Horn, Marad ROS RO/RO, 22,000 BHP** |
|---|---|

*Chief Engineer*

Responsible for main propulsion engine, diesel generators, all rotating machinery including pumps, air compressors, purifiers, reciprocating AC and refrigeration compressors and all hydraulics for ramps, car decks and winches, 40 ton electro-hydraulic crane, sewage treatment plant, evaporators, interior communications and electrical switchboard and distribution. Refurbished Bridge Control system and put it in use for the first time in more than 6 years.

1998 to **Cresmont Technical Services**
1999 *Program Manager*

Program Manager to design, build and operate a 3 megawatt methane-to-energy plant in Puyallup, Washington. Consultant to develop a West Coast facility for NAVSEA and MARAD vessel scrapping. Project Manager for tugboat acquisition and vessel conversion program to convert vessels into hospital ships. Consultant to bunker suppliers for fuel problems encountered on board.

1996 to **CBS Engineering, Inc.**
1998 *Senior Consulting Engineer*

Construction of barges, marine issues, plant operations and plant review. Oversaw construction and delivery of $3.8M barge (400'X 100') for production platform. Responsible for operational review of 80 megawatt gas turbine power plant, centrifuge operations and mooring of barges to API specifications including design review and selection of fendering system, and strength of the docking system. Performed analysis for FPSO operations and cost for conversions in shipyards around the world.

1994 to **Wehran Energy**
1996 *Plant Manager*

Ran all aspects of 2.5 megawatt methane gas to energy plant including investment to upgrade and plant expansion to 5 megawatts. Operation consisted of field expansion, field maintenance, compressing gas, flaring, condensate separation, electrical generation, pollution control and interfacing with town, county, and utility officials for upgrade and expansion.

ARTHUR W. FAHERTY, CMI
Marine Engineer and Mechanical Expert

1992 to
1994

**Fore River Shipyard & Iron Works, Inc.**
*Owner*
Shipyard repair and steel fabrication business. Drydocked vessels from barges to 860'
SeaBee class LASH vessel. Experienced in blasting and painting of hulls and tanks, engine
work, piping renewal, steel replacement, superstructure work, welding, brazing, oxyacetylene
cutting and welding, machining (lathes, milling machines). Workforce of up to 128 people. Also
accomplished steelwork for bridge sections and construction of barges for public authority.
Accomplished design work for steam driven power barges for international power plant
developer for use in South America and in the Middle East. Solved issues on delivering these
plants to the various areas; this included surveying various rivers in Colombia for future
installations.

1988 to
1992

**AK Engineering, Inc.**
*Founder, Stockholder and Vice President*
Company specialized in marine and industrial engineering projects. Responsibilities included
overhaul of 6 X 6.1 Megawatt diesel generators, large oil/water separation project for utilities,
ultra-high water pressure technologies for utilities and U.S. Post Office (cutting into a building in
NY city while mail was being processed for expansion), very fast track construction of co-
generation plant (gas driven engines with absorption and centrifugal chillers, boilers, pumps
and cooling towers all controlled by pneumatic controllers). Vessel activation and deactivation
for Operation Desert Storm (13 vessels).

1983 to
1988

**Various U.S. Shipping Companies**
*Consultant and Chief Engineer/Fleet Engineer*
Chief Engineer for three re-flaggings – two vessels were from Swedish flag to U.S. flag and one
vessel was from Liberian flag to U.S. flag. Installed generator control systems to make
generators fully automated. Surveyed vessels for owners to meet various RFP's with regard to
budget and operational characteristics. Supervised the dry-docking of ships, accomplished
troubleshooting of automation on board and provided corrective procedures, taught crews
how to perform under limited manning schedules. Assumed Chief Engineer duties on poorly
running vessels and returned vessels to maintenance status and in class while maintaining low
overtime. Vessels included dry cargo, RO/RO, car carrier and tanker. Experienced in all types
of diesel engines, generators, cranes-monorail, jib, electro-hydraulic, overhead; galley
equipment including dishwashers, fryers, potato peelers, potato mashers, ovens and ventilation
systems for the galleys, elevators for both people and cargo, winches, anchor handling and
heat exchangers. Also experienced with impact wrenches, Sweeney wrenches, hydraulic
stretching for cylinder and bearing bolts.

1978 to
1983

**Pacific Gulf Marine**
*Chief Engineer on Motor Vessels*
Several shipyard periods and class surveys accomplished. Vessel always remained on charter.


ARTHUR W. FAHERTY, CMI
Marine Engineer and Mechanical Expert

| | |
|---|---|
| 1971 to 1983 | **Various Shipping Companies** |
| | *Various Engineering Capacities from Third Engineer to Chief Engineer* |
| | Worked on German, Japanese and American vessels. Built ships in two U.S. yards and in one Japanese yard for various owners. Officer in Charge of Ammonia Refrigeration System (2 years). |
| | |
| 1983 | **Reflag of M/V American Eagle** |
| | *Chief Engineer* |
| | Responsible for the paperwork and physical work to convert the vessel from Swedish flag to American Flag including engine room and structural steel including fabricating and welding on the aft car decks. |
| | |
| 1978 to 1983 | **Pacific Gulf Marine** |
| | *Chief Engineer on Motor Vessels* |
| | Several shipyard periods and class surveys accomplished. Vessel always remained on charter. |
| | |
| 1976 to 1978 | **Zapata Bulk Transport 4 x 40,000 Product Tanker** |
| | *Machinery Inspector/Hull Inspector/Cargo Inspector* |
| | Responsible for signing off all machinery and piping in Engine room, cargo systems including pumproom and environmental trough for Class as well as machinery, cargo systems, pump room and controls for Zapata Courier. |
| | |
| 1974 to 1975 | **New Construction, Tsuneishi, Japan for Sanko Lines, 80,000 dwt Crude Oil Tanker** |
| | *2nd Engineer* |
| | Responsible for signing off fueling stations, cargo piping and environmental trays, HFO Purifiers and main engine |
| | |
| 1973 | **New Construction of M/V Sugar Islander** |
| | *3rd Engineer* |
| | Responsible at yard for sign-off on fueling stations including environmental wells, purifiers, boiler, and evaporator at Lockheed Shipbuilding, Seattle. |

**PROFESSIONAL CREDENTIALS**

Certified Marine Investigator, International Association of Marine Investigation, Henderson, Nevada
Chief Engineer, Unlimited Horsepower-Motor
Third Assistant Engineer
Unlimited-Steam 8th Issue, Current through April 2010



THE EXPERTS
# Robson Forensic

ARTHUR W. FAHERTY, CMI
Marine Engineer and Mechanical Expert

## EDUCATION

B.S., Marine Engineering, United States Merchant Marine Academy, Kings Point, NY

*Additional Continuing Education:*
BOAT GPS Forensic Course, National Association of State Boating Law Administrators
(NASBLA), November 2018
International Association of Marine Investigators 28th Annual Training Seminar, Norfolk, VA,
March 2018
ABYC (American Boat and Yacht Council) Marine Law Symposium, Charleston, SC, January
2017
Education Day with Marine Insurance Association of Seattle, 2016
Achieving Safe Permit-Required Confined Space Entries, Prospering Safely (Fred Straub),
October 2013
Current Issues in Maritime Law, WSBA, October 2011
Maritime Personal Injury CLE (Lorman), Seattle, WA, July 2011
Sulzer Brothers Diesel Program, Winterthur, Switzerland

## CERTIFICATIONS

ABYC (American Boat and Yacht Council) Certified Master Marine Technician
ABYC (American Boat and Yacht Council) Certified Technician – Diesel Engines – Issued
04/30/2016, expires 04/30/2021
ABYC (American Boat and Yacht Council) Certified Technician - Marine Corrosion – Issued
03/07/2014, expires 03/07/2019
ABYC (American Boat and Yacht Council) Standards Certification – Issued 06/30/2016,
expires 06/30/2021
Universal Refrigeration Certification

## PRESENTATIONS

*Tools of the Trade*, ABYC Annual Law Symposium, Seattle, Washington, January 8, 2019

*CO Poisoning: Silent, Deadly and with Us All the Time (Lessons Learned from Litigation)*,
Western Trial Lawyers Association Convention, Maui, HI, June 13, 2013

# EXHIBIT I



RECEIVED
OCT 12 1981
LAW DEPARTMENT

## ASBESTOS

Asbestos is used in many varied forms such as board, cloth, fiber, rope packing, sleeving, tape, twine, yarn, sheet, and in other numerous combinations. The manner of storage depends upon the form of asbestos. Where the asbestos may possibly be in a loose form during storage, a dusty condition could be produced and proper ventilation should be provided.

### PROPERTIES

FIRE - Non-flammable.

EXPLOSION - Non-explosive.

BREATHING - Dust from asbestos materials may produce a chronic lung disease if it is breathed in sufficient concentrations over a period of years. In some persons, the disease may develop much more rapidly than in others. The concentration and particle size of the dust will also influence the number of years of exposure required to produce the disease. In any case, exposure even to high concentrations of asbestos dust for a period of a few days or even a few months will not produce the disease. Particles larger than about 10 microns (0.000039 in.) cannot get into the small lung air sacs to cause damage. Such small particles are far below the size which is visible to the naked eye. Most dusts, however, have particles of a large range of sizes which vary from visible to invisible. It is only the fine invisible dust particles that are effective in producing asbestosis.

Where people may breathe the dust, the Maximum Allowable Concentration is 5 million particles per cubic foot of air, unless the exposure is for less than one hour per day, in which case a

slightly higher concentration may be permitted but must not exceed 10 million particles per cubic foot. These Maximum Allowable Concentrations apply to repeated or recurring daily exposures. Where asbestos may be mixed with other less harmful dusts, the concentration of asbestos dust will be the controlling factor. The asbestos dust concentration can be determined by collecting and analyzing air samples.

SKIN IRRITATION - Asbestos is usually not a skin irritant.

### PERSONAL PROTECTIVE EQUIPMENT

WHEN IT IS NECESSARY TO WORK IN AN AREA CONTAINING HIGH DUST CONCENTRATIONS, AN AIR-LINE RESPIRATOR OR HOSE MASK WITH OR WITHOUT A BLOWER MAY BE USED. The air-line respirator should have 8 to 15 lbs/sq.in. pressure. Care should be taken so that contaminated air does not enter the hose for the hose mask.

For medium dust concentrations, the standard all dust respirator 8883-5, equipped with filter 8883-6, may be used. Filters should be replaced according to a predetermined schedule or at any time breathing becomes difficult.

All respirators and replacement parts should have the Bureau of Mines approval which is indicated by a label on larger parts or BM#_____ (approval number) on smaller parts.

### PRECAUTIONS

A PERSON SHOULD NOT ENTER AN AREA CONTAINING AN EXTREMELY HIGH CONCENTRATION OF ASBESTOS DUST FOR A PROLONGED PERIOD OF TIME WITHOUT ADEQUATE PROTECTION. THE MAXIMUM ALLOWABLE CONCENTRATION

*WHEN IN DOUBT*
*CONSULT MEDICAL OR SAFETY DEPARTMENT*

Printed in U.S.A.                                    EAST PITTSBURGH, PA.

## ASBESTOS (Continued)

OF 5 MILLION PARTICLES OF DUST PER CUBIC FOOT OF AIR SHOULD NOT BE EXCEEDED FOR REPEATED OR CONTINUOUS EXPOSURES. THIS MAY BE ACCOMPLISHED BY COMPLETELY ENCLOS-ING THE SYSTEM OR BY PROVIDING ADEQUATE VENTILATION. PROPER PREPLACEMENT AND PERIODIC PHYSICAL EXAMINATIONS SHOULD BE MADE BY THE MEDICAL DEPARTMENT ON PERSONS WHO WORK WHERE THERE IS REPEATED OR RE-CURRING EXPOSURE TO ASBESTOS DUST.

*WHEN IN DOUBT*
*CONSULT MEDICAL OR SAFETY DEPARTMENT*

East Pittsburgh, 2-C-46
Industrial Hygiene Laboratory

June 11, 1954


PLAINTIFF'S
EXHIBIT
WH-350

SOUTH PHILADELPHIA WORKS
Industrial Relations
Mr. W. E. McKeldin
Safety Supervisor

With respect to the room in which asbestos cloth is being cut and sewed,
the air samples did not indicate exposure to concentrations of asbestos
dust above 5 million particles per cubic foot, which is presently regarded
as the maximum allowable concentration. However, I have a feeling that
these concentrations may vary from time to time in the room. It would be
very desirable to ventilate the room more effectively so that the amount
of asbestos dust in the breathing atmosphere would be further reduced.
When sheet material is being thrown from one bench to another, the con-
centrations of asbestos fibers in the breathing atmosphere of the sewer
in particular would appear to be potentially hazardous. As you know,
in the State of Pennsylvania, when a person's chest contains some silicosis
and it becomes superimposed with tuberculosis, that this disease becomes
compensable. I believe that the same is true in the case of asbestosis.
Frequently, the early stages of asbestosis or silicosis are difficult to
detect by X-rays and it is also believed that persons suffering from be-
ginning stages of asbestosis or silicosis are more likely to develop
tuberculosis.   We have such a case in Compensation Court from one of our
plants at the present time and they are difficult cases to handle.

As you know, the present fan in the side wall of this room is quite noisy
and the men do not operate it more than necessary on account of the noise
situation. Therefore, the ventilation of this room should be reconsidered.
In the revision of the ventilation of this room, it might be most desirable
to have the fan placed on the side of the room with the large number of
windows since a good portion of the dust already is moving in this direction.
It would be desirable to use a different type of fan in the improvement of
this room. By placing the fan on the side wall presently containing most
of the windows, the dust fibers collecting along this side of the wall would
be ventilated to the outside of the building rather than dragged past the
breathing level of the men doing the sewing.

I will greatly appreciate knowing what your final decision on this problem
will be.

L. Wilbur Speicher, Administrator
Industrial Hygiene

P.S. These dust samples were found to contain extra fine particles
which would indicate their being more hazardous.

WS.

*Westinghouse*

DN    6S711AA-AJ          - PD SPEC (PDS) -
RL    Rev W
DA    Mar 5, 1978

TI    CABLE, ASBESTOS INSULATED

CA    CAUTION:  CUTTING OR MACHINING WILL PRODUCE ASBESTOS DUST.  DUST
      SHALL NOT BE BREATHED.  ADEQUATE LOCAL EXHAUST VENTILATION SHALL
      BE PROVIDED.  SEE SPDS A-20.

SU    SUPPLIERS:
      (6S711AA)
      (6S711AB)                                          A-B-D-E-F-G
      (6S711AC)                                          A-B-C-D-E-F-G
      (6S711DJ)  (All Plants except Elevator)            C-D
                 (Elevator)                              A-B-D
                                                         A-B-D-H

      (A) Cerro Wire and Cable Co (Cerro) 550 Nicoll St, New Haven, CT
          06504
      (B) Coleman Cable Co, 1900 N Fifth Ave, River Grove, IL  60181
      (D) Continental Wire and Cable Corp (Anaconda) Quilson Rd, York, P
          17404
      (E) Okonite Co, PO Box 340, Ramsey, NJ  07446
      (F) Phelps Dodge Cable and Wire Co, Foot of Point St, Yonker, NY
          10702
      (G) Radix Wire Co, 26252 Lakeland Blvd, Cleveland, OH  44132
      (H) United States Steel Corp (Wire and Cable Div) Ballard St,
          Worchester, MA  01607

OR    ORDER FROM SUPPLIER AS:  Cable (or Wire), stating P D Spec Number and
      Rev Letter.

CH    CHARACTERISTICS:

| Grade | Previous Grade | Users | Insulation | Treated Braid |
|-------|----------------|-------|------------|---------------|
| 6S711AA | 7419-2 | BG BS EP JC MAR SDD | VC & Asb | Asb§ |
| 6S711AB | 7419-3 | BG BS EP JC LAE PT | Asb | Asb§ |
| 6S711AC | | PTB SH | | |
| 6S711AD | 7419-4 | WE | Asb | Asb |
| 6S711AE | 7419-5 | | Obsolete. | |
| 6S711AF | 7419-8 | | Obsolete. | |
| 6S711AG | 7419-12 | | Obsolete. | |
| 6S711AH | 7419-15 | | Obsolete. | |
| 6S711AJ | 7419-16 | | Obsolete. | |
| | 7419-1 | BE BG BS EP JC WE SDD | VC & Asb | Cotton§ |

Westinghouse Electric, R&D    (FSCM 79500)   Pg 1 of 2,  PDS 6S711AA-AJ
Corp Stds, Pittsburgh, PA 15235              Rev W : Mar 5, 1978

93144215

SHERM00012



| Grade | Braide Color | Type | Voltage* |
|-------|--------------|------|----------|
| 65711AA | Black | AVA | 600 |
| 65711AB | Black | AIA | 600 |
| 65711AC | Black | AIA | 600 |
| 65711AD | | | |
| 65711AE | | | |
| 65711AF | | | |
| 65711AG | | | |
| 65713AH | | | |
| 65711AJ | Gray | AVB | 600 |

  Tinned copper wire, except 65711AB has untinned conductor
* Unless otherwise specified.
§ Contains fungicide.
* Circuit voltage, phase to phase.

AP   APPLICATION:
    (65711AA,AJ) Switchboard and control wiring.
    (65711AB,AC) Apparatus leads; general use.

CP   CORPORATE PART NUMBER:  POS No. + Size Code
    Example:  65711AA59L (CABLE - If reference name is desired)

FSCM 79600

Pg 2, POS 65711AA-AJ
Rev 6 : Mar 5, 1976

03144217

SHERM00013

ASBESTOS PAPER
CAUTION:  DUST RESULTING FROM HANDLING OR MACHINING SHALL NOT BE BREATHED.  USE ONLY WI
LOCAL EXHAUST VENTILATION.  SEE SPDS A-20.
SUPPLIERS -
         (42331AA)(Except .007" & .010" thk)          A-B
                  (.007" thk only)                     B
                  (.010" thk only)(Except HA)          B
                               (For HA)                A-B

  (A) Johns-Manville, Greenwood Plaza, Denver, CO    80217
  (B) Nicolet, Inc, Wissahickon Ave, Ambler, PA    19002

ORDER FROM SUPPLIER AS - (42331AA) Paper, P D Spec 42331AA Rev AA.

CHARACTERISTICS - 42331AA (Previous 2118-1)(Users:AMD,BE,BG,BH,BHM,DA,EP,HA,M&R,PT,SH,S
Commerical grade asbestos paper of uniform quality.
  42331AB (Previous 2118-2) Obsolete.
  42331AC (Previous 2118-3) Obsolete.

  For properties & dimensions see PDS.

APPLICATION - General use.

SPECIFY BY - CODED IDENT (PDS No. + Size Code)
             Example:  42331AA3GD (ASB PAPER - If reference name is desired)


         Printed in U.S.A.            W Corp Std R&D          (Fed. CODE IDENT NO.

TD003090

MOLDED PARTS, CALCIUM SILICATE-ASBESTOS
CAUTION:  MACHINING PRODUCES ASBESTOS DUST.  DUST SHALL NOT BE BREATHED.  ADEQUATE LOCAL EXHAUST
VENTILATION SHALL BE PROVIDED.  SEE SPDS A-20.
SUPPLIERS : American Insulator Corp, 1930 Main St, New Freedom, PA    17349

ORDER FROM SUPPLIER AS –
  (46316AJ,AL,AM) AICO 5, stating drawing and item number.
  (46316AK) AICO 5 plus 1.5% Carbon Black, stating drawing and item number.

CHARACTERISTICS – 46316AJ (Previous 161-1)(User:BG) White, inorganic, cold molded composition
consisting of calcium silicate and asbestos, having properties as follows:

| | |
|---|---|
| Tensile Strength, Psi | 2200 |
| Compressive Str, Psi | 10910 |
| Flexural Strength, Psi | 3783 |
| Impact Str, Ft-Lb/In-Notch | .46 |
| Dielectric Strength, VPM | 43 |
| Arc Resistance, Sec | 556 |
| Heat Resistance, F | 1000 |
| Specific Gravity | 1.84 |
| Moisture Abs, 24 hr, % | 4-13 |

CANCELLED
Cr 20-84

46316AK (Previous 161-2)(User:BG) Same as 46316AJ except black.  Contains 1.5% carbon black.
46316AL,AM (Previous 161-3,-4)(User:BG) Same as 46316AJ except for specific applications.

APPLICATION – (46316AJ) Intricate inorganic cold molded parts.
  (46316AK,AL) Cold molded parts such as arc boxes.
  (46316AM) Cold molded insulating spacers for rotary switches.

SPECIFY BY – CODED IDENT (M No.)
          Example:  46316AJ (SILICATE ASB - If reference name is desired)
     Printed in U.S.A.          W Corp Std R&D          (Fed. CODE IDENT NO. 79500)

30071419

M    41521CC    Rev B    OBS./CANCELLED  5/5/78   Jul 5, 1976

WESTINGHOUSE PROPRIETARY

CLOTH, ASBESTOS, SILICONE VARNISH TREATED
CAUTION:  DUST RESULTING FROM HANDLING OR MACHINING SHALL NOT BE
BREATHED.  USE ONLY WITH ADEQUATE LOCAL EXHAUST VENTILATION.
SEE SPDS A-20.                  SUPERSED BY................

SUPPLIERS - Westinghouse Electric Corp, IMD, Bedford, PA   15522

ORDER FROM SUPPLIER AS - Treated Cloth 41521CC*

   *Stating "Permanently mark all containers with Westinghouse
M number."

CHARACTERISTICS - (Previous 1296-1)(User:M&R) Asbestos cloth
41511BB treated with silicone varnish 32102FH.

APPLICATION - Armature insulation.

SPECIFY BY - CODED IDENT (M No. + Size Code)
             Example:  41521CC1JX (TR ASB CLOTH - If reference
             name is desired)

Printed in U.S.A.   W Corp Std R&D   (Fed. CODE IDENT NO. 79500)

30020362

IN RE: AL ABRAMS November 1992

DN  ~~41511AA~~                    – PD SPEC (PDS) –
RL  Rev A
DA  Jul 5, 1976

TI  ASBESTOS TAPE, WOVEN

CA  CAUTION:  DUST RESULTING FROM HANDLING OR MACHINING SHALL NOT BE
    BREATHED.  USE ONLY WITH ADEQUATE LOCAL EXHAUST VENTILATION.  SEE
    SPDS A-20.

SU  SUPPLIERS:

    (A) Amatex Corp, 1030 Stanbridge St, Norristown, PA  19404
    (B) Atlas Textile Co, 538 Walnut St, North Wales, PA  19454
    (C) H K Porter, Inc, 1000 Seaboard St, Charlotte, NC  28206
    (D) Raybestos-Manhattan, Inc, 100 Oakview Dr, Trumbull, CT  06611
    (E) Uniroyal, 1230 Ave of Americas, NY, NY  10020

    (.010" thk)                A-B-E
    (.015", .025" thk)         A-B-C-D-E

OR  ORDER FROM SUPPLIER AS: Tape, P D Spec 41511AA Rev A.

CH  CHARACTERISTICS:  (Previous 1598) (Users: BM EP JC MAR PT SH) Closely
    woven, unsized asbestos tape, .010", .015" and .025" thk.  Tape
    .015" thk and over is constructed of asbestos yarns, both warp and
    fill, which may contain 20% (max) cotton.  Tape .010" thk contains
    in addition to asbestos warp yarns two cotton threads at each edge
    and filler is of fine cotton yarn.  Cotton content of asbestos
    warp threads is approx 17% and total percentage of cotton is
    approx 27%.

        For additional properties and construction details see PDS.

TL  TOLERANCES:  See PDS

EQ  EQUIVALENTS(ref only):  MIL-I-3053, tape. grade U.G., type 2PU

        TRADENAMES:  MIL I 3053 GR U G TYPE 2PU

AP  APPLICATION:  Taping TI 130 armature coils.

CP  CORPORATE PART NUMBER:  PDS No. + Size Code
        Example:  41511AA1BM (ASB TAPE - If reference name is desired)
        -
        -
        -
        -
        -
        -
        -
        -
        -
        -
        -

Westinghouse Electric, R&D    (FSCM 79500)   Pg 1 of 1,  PDS 41511AA
Corp Stds, Pittsburgh, PA 15235              Rev A ; Jul 5, 1976

November 1992

IN RE ABRAMS

MWBB-0032278

- PD SPEC (PDS) -

| | |
|---|---|
| DN | 42231AA-AB |
| RL | Rev D |
| DA | Jan 20, 1977 |

TI — ABESTOS PAPER

CA — CAUTION: DUST RESULTING FROM HANDLING OR MACHINING SHALL NOT BE BREATHED. USE ONLY WITH ADEQUATE LOCAL EXHAUST VENTILATION. SEE SPDS A-20.

SU — SUPPLIERS:
(42231AA) Johns-Manville, Greenwood Plaza, Denver, CO 80217

OR — ORDER FROM SUPPLIER AS: (42231AA) Paper, P D Spec 42231AA Rev D.

CH — CHARACTERISTICS: 42231AA (Previous 4262-1) (User: BM BMM CL EP M&R TM) High grade asbestos paper composed of nonferrous type asbestos fiber specially manufactured to be free from conducting particles. It is much freer from conducting particles than commercial asbestos paper 42331AA and is considerably more expensive.

| Thk, Inch. | Tens Str, Min (Lb/In Width) | | Tear Str, Min (Gm/In. Width) | | Apparant Density Grams/cc | | Basis Weight, Lb/100 Sq Ft | |
|---|---|---|---|---|---|---|---|---|
| Nom | MD | CMD | MD | CMD | Min | Max | Min | Max |
| ----- | -- | --- | -- | --- | --- | --- | --- | --- |
| 0.005 | 12 | 7 | 20 | 28 | .65 | .91 | 1.7 | 2.3 |
| .0065 | 15 | 9 | 28 | 39 | .76 | .89 | 2.4 | 3.1 |
| .007 | 17 | 10 | 29 | 40 | .69 | .95 | 2.9 | 3.5 |
| .010 | 20 | 12 | 40 | 47 | .67 | .92 | 3.6 | 4.8 |
| .015 | 23 | 13 | 62 | 77 | .69 | .94 | 5.5 | 7.5 |

42231AB (Previous 4262-2) Obsolete.

TL — TOLERANCES: See PDS

EQ — EQUIVALENTS(ref only): MIL-I-3053, type 2PU
TRADENAMES: MIL I 3053 TYPE 2PU QUINORGO 4000

AP — APPLICATION: Treated with shellac for field coil insulation.

CP — CORPORATE PART NUMBER: PDS No. + Size Code
Example: 42231AA18Q (ASB PAPER - If reference name is desired)

Westinghouse Electric, R&D   (FSCM 79500)   Pg 1 of 1,   PDS 42231AA-AB
Corp Stds, Pittsburgh, PA 15235         Rev D ; Jan 20, 1977